935 So.2d 1084 (2006)
Shirley Hodge FUNDERBURK, Appellant
v.
Milton JOHNSON, Individually and in his Capacity as an Officer of Hyde Brothers Lumber Company; Ginger Johnson, Individually and in her Capacity as an Officer of Hyde Brothers Lumber Company; and Hyde Brothers Lumber Company d/b/a True Value Hardware Store, Appellee.
No. 2004-CA-01446-COA.
Court of Appeals of Mississippi.
March 28, 2006.
Rehearing Denied August 8, 2006.
*1090 David G. Hill, Ralph Stewart Guernsey, David L. Minyard, attorneys for appellant.
Amanda McMillan Urbanek, Wilton V. Byars, Robert Michael Tyner, Jr., attorneys for appellees.
Before LEE, P.J., IRVING and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. Shirley Hodge Funderburk sued her former employer, Hyde Brothers Lumber Company and its owners and officers, Milton Johnson and Ginger Johnson (collectively "Hyde Brothers"). Funderburk asserted several claims arising out of Hyde Brothers' instigation of embezzlement charges against Funderburk. Funderburk appeals from the grant of a directed verdict as to all of her claims.
¶ 2. Funderburk argues that the trial court erred in dismissing her claims because the defendants failed to state specific grounds for their original and renewed motion for a directed verdict as required by Mississippi Rule of Civil Procedure 50. Funderburk further argues that the trial court erred by dismissing her claims because she presented evidence sufficient to support each element of her claims against Milton of (1) malicious prosecution; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; and (4) defamation; and against Ginger of (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; and (3) libel. Funderburk argues that Hyde Brothers was vicariously liable for the torts of Milton and Ginger and further asserts that there was sufficient evidence to support the tort of malicious prosecution against Hyde Brothers based upon its vicarious liability for Ginger's acts.
Finding no error, we affirm.

FACTS
¶ 3. From August 15, 1996 to January *1091 22, 1999, Funderburk[1] worked as the bookkeeper of the True Value Hardware Store in Tunica. Hyde Brothers owned and operated the Tunica store and another hardware store in Clarksdale. Milton Johnson owned Hyde Brothers and was its chief executive officer. Milton's daughter, Ginger Johnson, was a part owner of Hyde Brothers and its chief financial officer. Milton and Ginger worked at the Clarksdale store and occasionally visited the Tunica store. The accounts of the Tunica and Clarksdale stores were kept separately, and Funderburk had no bookkeeping responsibilities related to the Clarksdale store.
¶ 4. Funderburk performed general bookkeeping duties at the Tunica store. The store's cash, checks and credit card slips collected throughout the day were kept in a drawer. Every morning, Funderburk compared the amounts of cash, checks, and credit card charges collected throughout the Tunica store's previous business day with the amounts of cash, check, and credit card sales shown by a computer printout of the day's sales totals. This printout was known as the daily cash balance worksheet (daily worksheet). The daily worksheet showed the amounts of cash, checks, and credit card slips that should have been in the drawer based upon the information entered by the salespersons for each sale. Funderburk had to count the cash, checks, and credit card slips in the drawer to see if they matched amounts shown on the daily worksheet. The daily worksheet provided a number, labeled, "Net Cash," that reflected the dollar amount that had been rung up as cash sales. The sheet also had a blank space labeled "Ending Cash" where Funderburk would write in the amount of cash that was actually in the drawer.[2] The daily worksheet had corresponding information for checks; it provided the dollar amount of the check sales that had been rung up and had a blank where Funderburk would record the total dollar amount of checks that were actually in the drawer. After completing the daily worksheet, Funderburk would remove the cash and checks from the drawer and deposit them into the Tunica store's bank account.
¶ 5. Milton observed that the Tunica store experienced continuing cash flow problems. In late 1998, the store lacked the money to pay some of its bills. Milton asked Ginger to look into the money problem. Ginger planned on obtaining the needed funds by collecting amounts due from the store's accounts receivable customers. These were customers who bought materials from the store on credit and made periodic payments toward their accounts. Ginger noticed that the accounts receivable ledger showed that a very large sum of money was owed to the store. She ran a printout that showed what each individual customer owed. This printout revealed that the individual customers actually owed much less than the amount that the accounts receivable ledger had said was outstanding. Ginger notified Milton of this discrepancy and continued investigating. She discovered instances of someone having debited the store's cash-on-hand ledger and having credited that amount to the accounts receivable ledger. This had artificially inflated the amount shown by the accounts receivable ledger.
¶ 6. In January 1999, Milton decided to close the Tunica store because its profits *1092 had not increased over a period of years and the business was not growing. In anticipation of the closing of the Tunica store, he instructed its manager, Brad Walhood, to terminate Funderburk immediately. After Funderburk's departure, the Tunica store's daily worksheets and deposits were handled at the Clarksdale store until the Tunica store closed in or around June 1999. Soon after Funderburk left, Milton had the Tunica store's financial records shipped to Clarksdale. He began reviewing the Tunica store's daily worksheets and noticed that the amount of cash actually collected, which was entered under "Ending Cash," usually matched the amount of cash sales shown by the computer under "Net Cash." From his experience in retail sales, Milton thought that it was unusual for the amount of daily sales rung up as cash to so frequently match the amount of cash actually collected that day. He thought that something was amiss.
¶ 7. Hyde Brothers's regular accounting firm was Barfield, Lindsey, Gainspoletti, and Gladden, Ltd. In March 1999, Milton told the firm's accountants about a potential problem. Due to the ongoing tax season, the accountants were unable to begin immediately investigating the problem. Milton and the accountants decided to delay the investigation until after June 30, 1999, the end of the Hyde Brothers's fiscal year. At some point, Milton informed the district attorney's office that his accountants were going to investigate the possibility of theft at the Tunica store.
¶ 8. In fall 1999, Dick Howell and Paul Watts, certified public accountants with the Barfield firm, reviewed the Tunica store's financial records. Milton told Howell and Watts that Funderburk was the bookkeeper and responsible for filling out the daily worksheets and making the deposits. Howell and Watts closed the Tunica store's books and performed a cash audit of the books. They compared the daily worksheets with the bank deposit slips. They discovered that, on many days, the total amount of the cash collected by the store, shown as "Ending Cash" on the daily worksheet, had not been deposited into the Tunica store's bank account. The first time this practice had occurred was on August 28, 1996, approximately two weeks after Funderburk became the bookkeeper. This practice had resulted in a cash shortage of $277,701.34, reflecting a discrepancy in the amount of cash collected by the store and the amount of cash deposited in the Tunica store's account over a period of three years. Howell and Watts also discovered numerous entries that had debited the cash-on-hand ledger and credited that amount to the accounts receivable ledger. This reduced the amount shown by the cash-on-hand ledger. On December 20, 1999, Howell sent Milton a letter stating, "it is my conclusion that Shirley Hodge is responsible for the cash shortage of $285,586.42."[3]
¶ 9. Milton gave a copy of Howell's letter to the district attorney's office, which assigned the case to Assistant District Attorney David Hall. Hall was a certified public accountant. He independently reviewed the Tunica store's financial records and then recommended that the district attorney initiate proceedings against Funderburk. The district attorney presented the case to the grand jury, which, on February 15, 2000, returned a true bill against Funderburk charging her with embezzlement.
¶ 10. Hyde Brothers had an insurance policy with The Hartford Fidelity & Bonding Company that covered loss due to employee *1093 dishonesty up to $25,000. On March 20, 2000, Ginger sent a proof of loss statement to Hartford stating that Hyde Brothers had suffered a loss due to the dishonesty of Funderburk. At some point, Hyde Brothers recovered $25,000 under the policy.
¶ 11. After a three day trial in April 2001, Funderburk was acquitted. On May 18, 2001, Funderburk filed a lawsuit that included claims against Milton for malicious prosecution, intentional and negligent infliction of emotional distress, and defamation; against Ginger for intentional and negligent infliction of emotional distress and libel; and against Hyde Brothers under the theory of respondeat superior for the torts of Milton and Ginger, including malicious prosecution based upon Ginger's conduct.
¶ 12. At the trial in May 2004, Funderburk sought to show that the cash shortage had been caused by Hyde Brothers's sloppy accounting practices. Funderburk testified that Walhood had assisted her with the daily count of the drawer and with completing the daily worksheets. She testified that the "Ending Cash" amount on the daily worksheet that reflected the total amount of cash collected that day was always correct. Funderburk stated that Ginger or Walhood routinely instructed her not to deposit the entire amount of cash into the Tunica store's bank account. She stated that, in those instances when all the cash was not deposited, it was because Ginger or Walhood had told her how much cash to withhold from the deposit. Funderburk testified that she had never made the decision not to deposit all the day's cash. She stated that Walhood had approved each deposit slip. She stated that, out of an abundance of caution, she had kept a record of the cash withheld from the deposit on a legal pad but that Walhood had confiscated the pad when he terminated her.
¶ 13. Funderburk further testified that the cash withheld from the deposit was kept in a bank bag in the top drawer of her desk. Funderburk stated that Ginger frequently called from the Clarksdale store and requested that she send cash from the bag to the Clarksdale store. These cash transfers were never documented. Funderburk stated that she frequently sent cash to the Clarksdale store in this manner. She stated that she had complained to Milton about this practice but that he had instructed her to work it out with Ginger. Funderburk stated Walhood had used the withheld cash as petty cash for buying turkeys and poinsettias for the store's customers at Christmas, paying the employees their Christmas bonuses, cashing employee payroll checks, and paying for cash-on-delivery items. Funderburk also testified that Ginger had taken cash from the drawer without leaving a check or a voucher.
¶ 14. Funderburk admitted that, when petty cash was taken out of the drawer, documentation was placed in the drawer to account for the missing funds and that she made a note of it on the daily worksheet. Funderburk also admitted that, whenever someone cashed a check at the store, that check was accounted for on the daily worksheet. She admitted that any cash taken from the drawer without documentation would have caused a shortage to be reflected by the daily worksheet.
¶ 15. Funderburk stated that Ginger had instructed her by phone to make the manual entries debiting the cash on hand ledger and crediting the accounts receivable ledger. She stated that Ginger told her to destroy a monthly printout that "showed the accounts in the red" in order to conceal it from Milton and told her to make changes when reconciling the bank *1094 statements. R.A. Wilson, a fraud investigator testifying on behalf of Funderburk, stated that the Clarksdale store did not deposit cash on a daily basis and, after Funderburk departed, the Tunica store stopped depositing cash on a daily basis. From this, Wilson concluded that it was a common business practice of Hyde Brothers to withhold cash from the daily deposit.
¶ 16. With her evidence, Funderburk sought to show that Milton and Ginger had known that Funderburk was not responsible for the cash shortages when they initiated criminal proceedings against her. Funderburk's testimony was contradicted by testimony from Ginger, Walhood, and Milton given during the defense case. Ginger worked at the Clarksdale store and occasionally visited the Tunica store. Ginger denied having instructed Funderburk to withhold cash. Ginger said she had never instructed Funderburk to make any changes to the ledgers; Ginger had full access to the Tunica store's ledgers from the Clarksdale store and would have had no reason to make Funderburk adjust the ledgers for her. Ginger admitted that she could have discovered the discrepancies earlier by reviewing the daily worksheets, deposit slips, and ledger entries. She said she did not check Funderburk's bookkeeping work because she had trusted Funderburk and that the first notice she had of a discrepancy was the accounts receivable problem in 1998. The Tunica store's books had balanced at tax time each year, which had further contributed to her sense of security. Ginger testified that cash was never transferred from the Tunica store to the Clarksdale store and that monetary transfers between the stores were done by check. She stated that she had never taken cash from the Tunica store without accounting for it via voucher or check, which would have been part of the "Ending Cash" amount on that day's daily worksheet.
¶ 17. Walhood testified that Funderburk was solely responsible for the Tunica store's bookkeeping, that he had not assisted Funderburk with counting the drawer or with the daily worksheet, and that he did not approve the daily deposit slips. He denied having told Funderburk to withhold cash. He denied that the Tunica store ever kept a bag of cash in Funderburk's desk. Walhood testified that he had used cash from the drawer to buy turkeys and poinsettias, to cash payroll checks for employees, and to pay for cash-on-delivery items, and that he had always left documentation of the cash deficit in the drawer so that these transactions would be noted on the daily worksheet.
¶ 18. Milton stated that, until late 1998, he had not suspected that the Tunica store had a cash problem because the books always balanced. Milton testified that there was no missing cash beyond the day of Funderburk's departure from the Tunica store. He testified that, though cash deposits were no longer made on a daily basis, all the cash collected by the Tunica store after Funderburk left was accounted for.
¶ 19. Both Funderburk and Hyde Brothers presented expert testimony concerning the cash shortages. Funderburk's expert, R.A. Wilson, opined that the Tunica store's financial records did not support the conclusion that Funderburk had embezzled cash. Wilson admitted that the offsetting ledger entries would have caused the books to appear to balance, but that anyone looking at the individual entries would have noticed the problem. Hyde Brothers's expert, Ralph Q. Summorford, testified that the Tunica store's financial records were supportive of the conclusion that Funderburk was responsible for the missing cash and that Milton had acted reasonably in blaming Funderburk. *1095 Summorford also testified that, during Funderburk's employment at Hyde Brothers, she had a joint checking account with her then-husband, Marlin Hodge, into which someone had deposited approximately $90,000 in cash during the period of Funderburk's employment. Funderburk presented testimony from her family members explaining the sources of the $90,000 cash deposits, including rent paid to her in cash by her daughter and brother-in-law, cash income from Marlin's firewood and lawn care business, and cash given to Funderburk by her new husband, Doyle Funderburk.
¶ 20. At the close of Funderburk's evidence, the defendants moved for a directed verdict. The trial court granted the motion in part by directing a verdict as to all of Funderburk's claims against Milton. At the close of all the evidence, the court granted the defendants' renewed motion for a directed verdict, resulting in the dismissal of all of Funderburk's remaining claims. On June 18, 2004, the court denied Funderburk's motion for a new trial. Funderburk has appealed.
¶ 21. We have rearranged Funderburk's appellate issues somewhat in order to address her arguments pertaining to Mississippi Rule of Civil Procedure 50 in the most logical fashion.

I. THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT ON FUNDERBURK'S CLAIMS BECAUSE THE DEFENSE DID NOT STATE THE SPECIFIC GROUNDS ON WHICH THE MOTION WAS BASED.
¶ 22. Funderburk argues that the trial court committed reversible error in granting the motion for a directed verdict because the defendants failed to state the specific grounds for the motion as required by Mississippi Rule of Civil Procedure 50(a). Rule 50(a) provides that "[a] motion for a directed verdict shall state the specific grounds therefor." It has been stated that, "a motion for a JNOV or a directed verdict must set out specific, not general, facts that demonstrate a failure to establish a prima facie case." Harrison v. McMillan, 828 So.2d 756, 764(¶ 21) (Miss. 2002). The specific ground requirement is useful in that it gives the opposing party a chance to mend its case and makes the trial court aware of the moving party's position. McCann v. Texas City Refining, Inc., 984 F.2d 667, 672 n. 6 (5th Cir.1993).
¶ 23. The record reveals that the defendants did not state the specific grounds for their original motion for a directed verdict that resulted in the court's dismissal of the claims against Milton. The defendants did state grounds in support of their renewed motion for a directed verdict, but Funderburk argues that this statement of grounds was insufficiently specific to meet the requirement of Rule 50(a). Funderburk never objected to the lack of specific grounds supporting either the original or the renewed motion for a directed verdict. Rather, after both the original and the renewed motion, Funderburk argued that she had presented sufficient evidence to prove each element of her claims. Then, the court discussed the claims and stated the reasons why it found Funderburk's proof to be insufficient to enable the claims to go to the jury.
¶ 24. In determining proper practice under the Mississippi Rules of Civil Procedure, this Court has applied persuasive authority on the federal rules to similarly worded state rule counterparts. Hartford Cas. Ins. Co. v. Halliburton Co., 826 So.2d 1206, 1215(¶ 32) (Miss.2001). Like Mississippi Rule of Civil Procedure 50(a), Federal Rule of Civil Procedure 50(a)(2) contains a specificity requirement for moving for a judgment as a matter of law. In considering *1096 Funderburk's argument that she is entitled to a new trial based on the defendant's failure to comply with the specific grounds requirement of Rule 50(a), we are guided by Wright & Miller's analysis of this issue under the federal rule:
[T]he trial court cannot err in passing on a motion for judgment as a matter of law that does not state the grounds sufficiently. If it denies the motion, the moving party may not complain about the denial on appeal. Conversely if it grants the motion, an adverse party who did not object to the lack of grounds in the trial court may not raise this point in the appellate court.

9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 2533 at 314 (1994) (emphasis added).
¶ 25. In Cox v. City of Freeman, 321 F.2d 887, 891 (8th Cir.1963), the Eighth Circuit reasoned that it would be both unfair and dilatory to allow the non-movant to raise the issue of the movant's failure to state specific grounds at the appellate level after remaining silent when the trial court rendered its decision on the motion. The Cox court held that the non-movant would not be heard to complain on appeal of his opponent's failure to state the specific grounds for a motion for a directed verdict unless the non-movant had objected to the lack of specificity at trial. Id. We agree with this reasoning. The Mississippi Supreme Court has stated that "[s]pecific objections are required to avoid costly new trials and to allow the offering party an opportunity to obviate the objection." Frierson v. Delta Outdoor, Inc., 794 So.2d 220, 223(¶ 7) (Miss.2001). Further, "the trial court will not be held in error unless it has had an opportunity to pass upon the question." Id. We find that Funderburk's failure to object at trial to the defendants' noncompliance with the specific grounds requirement of Rule 50(a) waived this argument on appeal.

II. THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT ON FUNDERBURK'S CLAIMS AGAINST MILTON BECAUSE THERE WAS SUFFICIENT EVIDENCE TO CREATE A JURY QUESTION AS TO EACH ELEMENT OF EACH CLAIM.
¶ 26. Funderburk first addresses the sufficiency of the evidence supporting her claims against Milton.

A. Standard of Review
¶ 27. Mississippi Rule of Civil Procedure 50 "is a device for the court to enforce the rules of law by taking away from the jury cases in which the facts are sufficiently clear that the law requires a particular result." M.R.C.P. 50 cmt. Rule 50(a) requires the trial court to take the case from the jury and grant a directed verdict if any verdict other than the one directed would be erroneous as a matter of law. M.R.C.P. 50 cmt.; McKinzie v. Coon, 656 So.2d 134, 137 (Miss.1995). The comment to Rule 50 instructs the trial court to look solely to the testimony of the party opposing the motion. "[I]f such testimony, along with all reasonable inferences which can be drawn therefrom, could support a verdict for that party, the case should not be taken from the jury." M.R.C.P. 50(a) cmt.
¶ 28. This Court affords de novo review to the lower court's grant of a directed verdict. In reviewing the grant of a directed verdict, we must "consider whether the evidence in opposition to the motion was of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment could differ as to the verdict." Collins v. Ringwald, 502 So.2d 677, 678 (Miss.1987). If so, the *1097 motion should have been denied. Id. But, if the evidence was so overwhelmingly in favor of the movant that reasonable persons could not have reached a different result, this Court must affirm the grant of a directed verdict. Harrison v. McMillan, 828 So.2d 756, 764(¶ 24) (Miss.2002).

B. Malicious Prosecution.
¶ 29. The elements of malicious prosecution are: (1) the institution of a proceeding; (2) by, or at the insistence of the defendant; (3) the termination of the proceeding in the plaintiff's favor; (4) malice in instituting the proceeding; (5) want of probable cause for the proceeding; and (6) the suffering of injury or damage as a result of the prosecution. Condere Corp. v. Moon, 880 So.2d 1038, 1042(¶ 13) (Miss. 2004). The plaintiff must prove each of these elements by a preponderance of the evidence. Id.
¶ 30. The supreme court has pronounced that malicious prosecution actions must be "managed with great caution." State ex rel. Foster v. Turner, 319 So.2d 233, 235 (Miss.1975). This is because these suits have a "tendency to discourage prosecution of crime as they expose the prosecutor to civil suits, and the love of justice may not always be strong enough to induce individuals to commence prosecution when if they fail, they may be subjected to the expenses of litigation even though they are found not liable for damages." Id. In other words, the threat of a malicious prosecution suit may deter citizens from attempting to bring wrongdoers to justice, necessitating a cautious approach to these suits.
¶ 31. It is undisputed that Funderburk met the first three elements of her malicious prosecution claim against Milton. The trial court found that Funderburk had failed to present sufficient evidence on the elements of malice and lack of probable cause. "Malice" in the law of malicious prosecution does not connote an evil intent. Strong v. Nicholson, 580 So.2d 1288, 1293 (Miss.1991). Rather, it means that the prosecution was instituted primarily for a purpose other than that of bringing an offender to justice. Id. In determining the presence of malice, the court looks to the defendant's objective, not his attitude. Malice may be and usually is shown by circumstantial evidence. Id. The question of malice is to be determined by the jury unless only one conclusion may reasonably be drawn from the evidence. Condere Corp., 880 So.2d at 1043(¶ 18).
¶ 32. Funderburk argues that Milton acted with malice because, though he knew Funderburk had not taken cash, he pressed charges against her anyway in order to recover $25,000 from his employee dishonesty insurance policy. The record reveals that, when Ginger filed the proof of loss claim under Hyde Brothers's employee dishonesty policy, she attached a copy of Funderburk's indictment as proof that the loss had occurred through employee dishonesty. In her brief, Funderburk implies that Milton could not have recovered under the employee dishonesty policy unless charges were filed against Funderburk. However, there was no showing that the insurance policy required Hyde Brothers to instigate charges against Funderburk in order to receive the insurance proceeds.
¶ 33. Funderburk points to evidence which she asserts was sufficient to establish that Milton pursued charges without enough evidence that Funderburk was the guilty party. Funderburk asserts that this evidence supports the inference that Milton was actually motivated by the insurance claim. We recite this evidence. Milton's accountant, Watts, stated that Milton asked him to examine the store's financial *1098 records from early 1996 through December 1999. Funderburk urges that, since this time period was close to the dates of Funderburk's employment, this showed that Milton sought to blame Funderburk. Watts testified that, when Howell drafted the opinion letter, Watts thought that Milton might use the opinion letter for insurance purposes. Funderburk also points to the testimony of accountants Howell and Watts that they based their conclusion that Funderburk was responsible for the cash shortages upon Milton's information that Funderburk was the employee who filled out the daily worksheets and made the deposits. Watts and Howell testified that they never told Milton that Funderburk had stolen the cash, but only that she was the person responsible for the shortages. Also, Funderburk points out that Milton did not conduct a fraud investigation before instigating charges against Funderburk, but instead relied on the conclusions of his accountants. Funderburk further points to Wilson's testimony that the cash depositing practices of the Clarksdale store and Tunica store after Funderburk's departure show that Hyde Brothers had a common business practice of holding cash from the daily deposits. From this, Funderburk argues, it may be inferred that Milton knew the cash shortages could not have been due to Funderburk's activities.
¶ 34. None of this evidence was sufficient to enable a reasonable juror to infer that Milton had a subjective intent to charge Funderburk for the primary purpose of collecting under Hyde Brothers's insurance policy rather than to bring her to justice. It was undisputed that Milton's accountants never encouraged him to pursue criminal charges against Funderburk, but that they opined that the person who filled out the daily worksheets and made the bank deposits had caused the shortages. Milton did inform the accountants that Funderburk was the person who performed these functions, leading to their ultimate conclusion that Funderburk was responsible for the shortages. But, Funderburk presented no evidence that Milton was aware of Funderburk's alternate explanation for the cash shortages at the time he initiated the charges. There was no evidence to support an inference that, when Milton pursued the charges, he did not actually believe that Funderburk was the person who had performed the duties which his accountants told him had caused the cash shortages. While the evidence cited by Funderburk could create an inference that Milton suspected that Funderburk was responsible for the cash shortages when he went to his accountants, there was no evidence that he was aware of but ignored an alternate explanation for the cash shortages at any time before initiating Funderburk's prosecution. Further, Milton was not required to have an employee prosecuted in order to recover the insurance proceeds. Viewing the evidence in the light most favorable to Funderburk, the sole conclusion to be drawn from the evidence was that Milton's motivation in pursuing charges was to bring Funderburk to justice. Therefore, Funderburk failed to present sufficient evidence to establish the element of malice.
¶ 35. We next address the evidence pertaining to want of probable cause to initiate a prosecution. "Probable cause requires the concurrence of (1) a subjective elementan honest belief in the guilt of the person accused, and (2) an objective elementreasonable grounds for such beliefs." Strong, 580 So.2d at 1294. The determination of probable cause is similar to negligence analysis and is usually a question for the court, not for the jury. Id. (quoting W. Prosser & W. Keeton, The Law of Torts, § 119 (5th Ed.1984)). The court must determine whether, from the facts apparent to the defendant, a reasonable *1099 person would have initiated the prosecution. Id. The probable cause determination is made from the facts apparent to the defendant at the time the prosecution is initiated. Croft v. Grand Casino Tunica, Inc., 910 So.2d 66, 74(¶ 25) (Miss.Ct.App. 2005).
¶ 36. As evidence that Milton lacked probable cause to initiate her prosecution, Funderburk points to her own testimony as to her alternate explanation for the cash shortages, the expert testimony of Wilson that there was no evidence that Funderburk took the money, and the fact that Milton's accountants never advised him to charge Funderburk. We conclude that Funderburk's evidence was insufficient to show that Milton lacked an honest, reasonable belief in Funderburk's guilt when he initiated the prosecution. Before initiating the prosecution, Milton had his accountants determine the cause of the cash shortages. The accountants concluded that the person who performed the bookkeeping functions at the Tunica store was responsible for the shortages. Milton told the accountants that this person was Funderburk. Funderburk presented no evidence from which it could be inferred that Milton did not honestly believe her to be guilty and suspected that someone else was responsible. We have already concluded in our discussion of malice that there was no evidence to support an inference that Milton had any knowledge of Funderburk's alternate explanation at the time he initiated the prosecution.
¶ 37. Funderburk contends that Milton lacked reasonable grounds for believing Funderburk to be guilty because a more thorough investigation would have led Milton to conclude that someone else had caused the shortages. The evidence established that Milton believed Funderburk was responsible for the bookkeeping tasks that resulted in the shortages. There was no evidence showing that, at the time the prosecution was initiated, there was any impetus for Milton to have doubted that Funderburk was the person responsible for keeping track of the cash at the Tunica store. Milton discovered the shortages, knew that Funderburk was responsible for the functions that caused the shortages, had his accountants investigate, and relied on their conclusion that Funderburk had caused the shortages. There was no evidence tending to show that Milton should have conducted a more thorough investigation. We find that Milton acted as a reasonably prudent business operator in relying on his knowledge of Funderburk's bookkeeping duties and on the opinions of his accountants in instigating the embezzlement charges against Funderburk.
¶ 38. We find that Funderburk failed to present sufficient evidence that Milton lacked probable cause to initiate embezzlement charges against Funderburk. Therefore, we affirm the trial court's grant of a directed verdict as to Funderburk's malicious prosecution charge against Milton.

C. Intentional Infliction of Emotional Distress.
¶ 39. Funderburk alleges that Milton's initiation of charges against her without a proper investigation caused her to suffer emotional distress. Funderburk presented evidence that, after being indicted and during the criminal trial, she suffered from high blood pressure that necessitated medication and several trips to the emergency room. She also experienced anxiety and sleeplessness.
¶ 40. In Mississippi, the standard for the tort of intentional infliction of emotional distress is very high, and focuses on the defendant's conduct rather than on the plaintiff's emotional condition. Jenkins v. City of Grenada, 813 F.Supp. 443, *1100 446 (N.D.Miss.1993). To prove a claim of intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct was extreme and outrageous, going beyond all possible bounds of decency. Brown v. Inter-City Fed. Bank for Sav., 738 So.2d 262, 264(¶ 9) (Miss.Ct.App.1999). Liability does not extend to "mere insults, indignities, threats, annoyances, or petty oppressions." Raiola v. Chevron U.S.A. Inc., 872 So.2d 79, 85(¶ 23) (Miss.Ct.App. 2004).
¶ 41. The behavior which Funderburk alleges caused her emotional distress was Milton's initiating embezzlement charges against her without a sufficient investigation into her guilt. We have already found that Funderburk failed to establish the malice and want of probable cause elements of malicious prosecution. Since Milton had probable cause to initiate charges against Funderburk, his conduct was not extreme, outrageous, or beyond all possible bounds of decency. See Croft, 910 So.2d at 75(¶ 32). We affirm the grant of a directed verdict as to Funderburk's intentional infliction of emotional distress claim against Milton.

D. Negligent Infliction of Emotional Distress.
¶ 42. Funderburk presents two arguments contesting the trial court's grant of a directed verdict as to her claim against Milton of negligent infliction of emotional distress. Firstly, Funderburk contends that the trial court failed to allow her to plead intentional and negligent infliction of emotional distress in the alternative, as demonstrated by the following colloquy during the parties' arguments on the directed verdict motion:
BY THE COURT: . . .
I'm going to dismiss the count of slander against Milton Johnson, [i]ndividually, and that's what we're looking at now, individually.
With regard to intention and negligent infliction of emotional distress by Mr. Johnson, I don't see it.
. . .
BY THE COURT: All right. With regard to malicious prosecution on Mr. Milton Johnson, individually?
. . .
BY MR. GUERNSEY:[attorney for Funderburk] [discussing the malice element of the tort of malicious prosecution] And that meaning is seeking any goal other than justice.
We have in fact heard and contended that what's gone on is that there was a charge made essentially in line with and there was testimony from the stand that the charge had to do with an insurance collection plan, that $25,000.00 came back to Mr. Johnson and the reason thatthe inference is that the reason for pressing the charge was to collect the insurance. It is in fact true that there had to be an accusation. Now, technically, I don't know whether there had to be an indictment or 
BY THE COURT: So, you're saying that he intentionally did that?
BY MR. GUERNSEY: Yes.
BY THE COURT: Which you have to do with malice.
Okay, well go  then I'll dismiss also the negligent count. So, right now, you're arguing malicious and intentional. Those are the only two that you have left.
BY MR. GUERNSEY: No, no. I  the negligence 
BY THE COURT: I don't want to hear anything about the negligence. I've already made my decision on those two counts.

*1101 Now, let's go to malicious prosecution and intentional infliction of emotional distress on Mr. Johnson, individually.
After this discussion, the tort of negligent infliction of emotional distress was not discussed again until the arguments pertaining to the claim against Ginger.
¶ 43. Funderburk argues that the trial court improperly barred her from pleading intentional and negligent infliction of emotional distress in the alternative. Funderburk argues that alternative pleading is specifically permitted by Mississippi Rule of Civil Procedure 8(a), which states, "[r]elief in the alternative of several different types may be demanded." It appears to this Court that the excerpted portion of the transcript shows that the trial court considered Funderburk's proof of negligence to be lacking, not that she was barred from alternative pleading. This issue is without merit.
¶ 44. Secondly, Funderburk argues that the evidence was sufficient to enable her negligent infliction of emotional distress claim to go to the jury. Funderburk argues that Milton was negligent in instituting Funderburk's prosecution because a more thorough investigation would have led him to doubt Funderburk's responsibility for the cash shortages. We have already concluded in our discussion of malicious prosecution that Milton conducted a reasonable investigation before charging Funderburk. Therefore, he was not negligent in initiating the charges. We affirm the trial court's grant of a directed verdict as to Funderburk's negligent infliction of emotional distress claim against Milton.

E. Defamation.
¶ 45. Funderburk argues that she presented sufficient evidence to support her defamation claim against Milton. Defamation is divided into two torts, including libel for written defamations and slander for oral ones. Speed v. Scott, 787 So.2d 626, 631(¶ 21) (Miss.2001). A claim of defamation requires the plaintiff to establish a false statement having the capacity to injure the plaintiff's reputation, in addition to other elements. Fulton v. Miss. Publishers Corp., 498 So.2d 1215, 1216 (Miss.1986).
¶ 46. On appeal, Funderburk contends that Milton defamed her by giving the district attorney's office the letter from his accountants stating that Funderburk was responsible for the cash shortages. As argued by Hyde Brothers, the evidence that Milton gave the letter to the district attorney's office was presented during the defense case, after the trial court had already directed a verdict on the defamation claim against Milton. Moreover, at the arguments on the motion for a directed verdict, Funderburk based her defamation claim upon Milton's communications with his accountants. Since the evidence of Milton's letter to the district attorney's office was not before the trial court or argued by Funderburk during arguments on the motion for a directed verdict, this ground for reversing the grant of a directed verdict on the defamation claim against Milton is barred from appellate consideration. Skrmetta v. Bayview Yacht Club, Inc., 806 So.2d 1120, 1126-27(¶ 24) (Miss. 2002).
¶ 47. Before the trial court, Funderburk argued that Milton's communications with his accountants about Funderburk were slanderous. As pointed out by Hyde Brothers, accountants Watts and Howell testified that Milton never suggested to them that Funderburk had taken the money. Rather, Milton told them that Funderburk was the bookkeeper at the Tunica store whose job involved filling out *1102 the daily worksheets and making the deposits.
¶ 48. A threshold question in a defamation suit is whether the statement made was defamatory, and this determination is made by the court. Fulton, 498 So.2d at 1216. For a statement to be defamatory, the statement must tend to injure one's reputation, to "diminish the esteem, respect, goodwill, or confidence in which [one] is held," or to "excite adverse, derogatory or unpleasant feelings or opinions" against one. Speed, 787 So.2d at 631(¶ 21) (quoting Prosser & Keeton on the Law of Torts § 111, at 771 (5th ed.1984)). Milton's statement to his accountants that Funderburk was the bookkeeper who performed certain duties was not defamatory in nature, and the trial court correctly granted a directed verdict as to Funderburk's defamation claim against Milton.

III. THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT AT THE CLOSE OF THE EVIDENCE AS TO ALL OF FUNDERBURK'S REMAINING CLAIMS.
¶ 49. After the grant of a directed verdict as to Funderburk's claims against Milton, the trial continued upon the claims against Ginger of intentional infliction of emotional distress, negligent infliction of emotional distress, and libel, and against Hyde Brothers of malicious prosecution based upon Ginger's acts. After the defense presented its case, Funderburk declined to present any rebuttal evidence. The trial court granted the defendants' renewed motion for a directed verdict, dismissing all of Funderburk's remaining claims.

A. Standard of review.
¶ 50. A renewed motion for a directed verdict is judged in the light of the case as it stands at the time of the renewed motion. M.R.C.P. 50 cmt. "Even though the court may have erred in denying the initial motion, such error is cured if subsequent testimony on behalf of the moving party repairs the defects of his opponent's case." Id. Therefore, in considering the propriety of the grant of the renewed motion, we apply our usual standard of review but also consider the evidence adduced during the defense case, viewing all of the evidence in the light most favorable to Funderburk and giving her the benefit of all favorable inferences to be drawn therefrom.

B. Malicious Prosecution.
¶ 51. Funderburk did not assert a malicious prosecution claim against Ginger. However, she contended that Ginger committed acts meeting the elements of malicious prosecution and that Hyde Brothers was vicariously liable for these acts. Funderburk's arguments pertain to the elements of malice and lack of probable cause pertaining to Ginger. However, we find compelling Hyde Brothers's argument that there was no proof that Ginger instituted or insisted on the institution of the proceeding against Funderburk.
¶ 52. Assistant District Attorney David Hall testified that he was notified of the potential shortages at the Tunica store by Milton, who later sent him the accountant's letter stating Funderburk was responsible for the shortages. Hall testified that Ginger never swore out an affidavit against Funderburk. Hall further testified that he did not speak with Ginger until preparing the criminal case for trial. This was the sole evidence of Ginger's involvement with the initiation of the embezzlement charges against Funderburk. We must determine whether Ginger's acts were sufficient to fulfill the element of malicious prosecution requiring the defendant to have instituted *1103 or insisted on the institution of the proceedings against the plaintiff.
¶ 53. The cases of Benjamin v. Hooper Elec. Supply Co., Inc., 568 So.2d 1182, 1188 (Miss.1990) and Winters v. Griffis, 233 Miss. 102, 101 So.2d 346 (1958) discuss the evidentiary parameters of the instigation element. "In order to show that a defendant instigated a proceeding the evidence must support a conclusion that the `defendant must have been the proximate and efficient cause of maliciously putting the law in motion in the original proceedings.'" Benjamin, 568 So.2d at 1188. The defendant must have been actively instrumental in putting the law in force. Winters, 233 Miss. at 108, 101 So.2d at 348. The defendant need not be the person who filed the direct charge; the defendant may be liable if she "communicated the subject matter to the person who signed the complaint and such statement proximately caused the prosecution." Benjamin, 568 So.2d at 1188, 1189. The defendant must have performed some affirmative action in causing the institution of the proceeding, or in encouraging the proceeding to continue after its institution. Id. This affirmative action may consist of advice, encouragement, or pressure. Id.
¶ 54. However, the instigation element is unfulfilled as to a defendant who has only "given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them." Id. at 1189. Thus,
[m]ere passive knowledge of, or acquiescence or consent in, the acts of another is not sufficient to make one liable.... No liability ... attaches merely by reason of testifying as a witness for the prosecution, or by reason of the fact that one's name was indorsed on an indictment or signed to an information or complaint prepared on an independent investigation by the prosecutor.
Winters, 233 Miss. at 108, 101 So.2d at 348-49; see also Downtown Grill, Inc. v. Connell, 721 So.2d 1113, 1117-18(¶ 13) (Miss.1998).
¶ 55. The trial testimony established that Milton initiated criminal proceedings against Funderburk by communicating with Assistant District Attorney Hall. Hall spoke with Milton and independently investigated the financial records. Then, the district attorney's office decided that there was probable cause to present the case against Funderburk to the grand jury. Ginger's only role in the prosecution was in speaking with Hall during his trial preparation, which occurred after the prosecution was initiated. Other than this activity, Ginger merely acquiesced in Funderburk's prosecution. Pursuant to Benjamin and Winters, the evidence of Ginger's conduct was insufficient to establish that she was instrumental in putting the law in force and that she proximately caused Funderburk's prosecution. We find that the trial court correctly directed a verdict on Funderburk's malicious prosecution claim against Hyde Brothers due to Funderburk's failure to establish the instigation element of malicious prosecution.

C. Intentional infliction of emotional distress.
¶ 56. As evidence supporting her intentional infliction of emotional distress claim against Ginger, Funderburk cites Ginger's admission that she took cash from the store at night without telling Milton and Funderburk's own testimony that Ginger and Walhood took cash without documenting it, that Ginger told her to destroy a monthly report to conceal it from Milton, and that Ginger instructed her to make changes to the bank statements to make *1104 them balance. Funderburk contends that Ginger, in order to conceal her own misdeeds from Milton, permitted Funderburk to be wrongfully prosecuted, causing Funderburk to suffer emotional distress.
¶ 57. The tort of intentional infliction of emotional distress requires an intentional act, one that is so extreme and outrageous as to exceed all possible bounds of decency. Brown, 738 So.2d at 264(¶ 9). The behavior which Funderburk claims caused her emotional distress was Ginger's allowing Funderburk's prosecution to continue despite having information that tended to show Funderburk was not guilty. We have already concluded that there was no evidence to show that Ginger initiated or insisted on the initiation of criminal proceedings against Funderburk. Rather, the district attorney's office decided to prosecute Funderburk after communicating with Milton and independently examining the Tunica store's financial records. Ginger's passive acquiescence in Funderburk's prosecution was not an intentional act sufficient to support a claim of intentional infliction of emotional distress.

D. Negligent Infliction of Emotional Distress
¶ 58. The next argument is that Ginger negligently inflicted emotional distress upon Funderburk through her negligent failure to sufficiently investigate the crime charged before instigating Funderburk's prosecution. Funderburk contends that Ginger violated a duty requiring one to sufficiently investigate a crime before charging its commission. Even if the breach of such a duty would support a claim of negligent infliction of emotional distress, the facts sub judice do not support the claim. We have already concluded that there was no evidence Ginger instigated criminal proceedings against Funderburk. The trial court correctly granted a directed verdict as to this claim.

E. Libel.
¶ 59. Funderburk argues that she presented sufficient evidence to allow her libel claim against Ginger to go to the jury. The elements of libel are:
(1) a false and defamatory statement concerning the plaintiff;
(2) an unprivileged communication to a third party;
(3) fault amounting at least to negligence on the part of the publisher; and
(4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
Blake v. Gannett Co., Inc., 529 So.2d 595, 602 (Miss.1988).
¶ 60. Funderburk argues that Ginger filled out a claim form under Hyde Brothers's employee dishonesty insurance policy that contained a false and defamatory statement concerning Funderburk. Ginger testified that, after Funderburk was indicted for embezzlement, she filled in the blanks of a proof of loss form and submitted it to Hartford. The form, with the portions typed by Ginger underlined, stated, "I, Ginger JohnsonCFO hereby certify that Hyde Brothers Lumber Company suffered loss through the dishonesty of Shirley W. Hodge employed as Bookkeeper and that the amount of money, securities or other covered property dishonestly misappropriated, amounts to $285,586.42 dollars...." At the trial, Funderburk contended that Ginger's publication of this statement to Hartford constituted libel per se. Funderburk did not assert that these statements were disseminated to any third parties other than Hartford.
¶ 61. Hyde Brothers argued that Ginger's statement was the subject of *1105 a qualified privilege. In reviewing defamation claims, "Mississippi courts ... must determine whether the occasion called for a qualified privilege." Eckman v. Cooper Tire & Rubber Co., 893 So.2d 1049, 1052(¶ 9) (Miss.2005). If a qualified privilege existed, then the court must determine whether the privilege was overcome by malice, bad faith, or abuse. Id. The definition of qualified privilege provides that:
[a] communication made in good faith and on a subject matter in which the person making it has an interest, or in reference to which he has a duty, is privileged if made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous, provided the statement is made without malice and in good faith.
Smith v. White, 799 So.2d 83, 86(¶ 7) (Miss.2001).
¶ 62. Hyde Brothers asserts that Mississippi courts have not addressed the question of whether the qualified privilege covers an insured's submission of a proof of loss form to its insurance company and requests that this Court find the qualified privilege applicable in this case. We find that the qualified privilege applies to the proof of loss form under the facts sub judice. In Mississippi, "an employer enjoys a qualified privilege when communicating on personnel matters to those who have a legitimate and direct interest in the subject matter of the communication." Bulloch v. City of Pascagoula, 574 So.2d 637, 642 (Miss.1990). For example, in Bulloch, the court found that the qualified privilege applied to a written communication from a police chief to a public safety commissioner requesting assistance for an outside investigation into a police officer's activities. Id.
¶ 63. Funderburk argues that Hartford lacked a legitimate and direct interest in the subject matter of the proof of loss form submitted by Hyde Brothers and, therefore, the qualified privilege does not apply. We disagree. In this case Hartford, like many insurance companies, required Hyde Brothers to submit a proof of loss form in order to make a claim under the insurance policy. The very existence of this requirement evinces that Hartford had an interest in ascertaining the facts undergirding the insurance claim in order to determine whether those facts described an incident covered by the policy.
¶ 64. Funderburk argues that the case of McFadden v. USF & G, 766 So.2d 20 (Miss.Ct.App.2000) stands for the proposition that Hartford had no interest in the subject matter of the proof of loss form. In McFadden, the insured injured a third party in a motor vehicle accident. Id. at 21(¶ 2). The insured had a liability policy with USF & G. Id. During the claims settlement process, the third party told USF & G's insurance adjuster that she was seeing Dr. McFadden for her injuries. Id. The adjuster told the third party that Dr. McFadden was a quack and a crackpot and that he, the adjuster, was unwilling to work to settle her claim if she persisted in seeing Dr. McFadden. Id. McFadden sued the insurance company for defamation. Id. at 21(¶ 1). This Court held that the qualified privilege did not apply to the insurance adjuster's comments to the third party. Id. at 25(¶ 16). We reasoned that,
as a general proposition, an insurance adjuster attempting to resolve a potential liability claim against his insured is in an adversarial relationship with the injured claimant. Matters such as the insured's degree of fault, the extent of any injuries, and the reasonableness of medical treatment are all areas of existing or potential dispute. The mere fact that the adversaries have a common interest *1106 in settling their dispute on mutually agreeable terms does not, in our view, create the kind of shared interest that would give rise to a privilege protecting adversaries during the settlement process.
Id.
¶ 65. The facts sub judice are readily distinguishable from those in McFadden. The communication in the instant case was between an insured and her insurer, not between an insurer and an injured third party adverse to the insured as in McFadden. McFadden does nothing to erode our conclusion that the qualified privilege applied to the proof of loss form that Hyde Brothers submitted to its insurance company.
¶ 66. Funderburk argues that, even if the qualified privilege applied, the evidence showed that Ginger acted with malice when she submitted the proof of loss form to the insurance company. Even where otherwise applicable, the qualified privilege does not apply if the statement at issue was made with malice or in bad faith. Eckman, 893 So.2d at 1053(¶ 13). "Actual malice" means that, at the time the statements were published, the speaker knew them to be false or made them with reckless disregard of their truth. Smith, 799 So.2d at 87(¶ 9). When the qualified privilege applies, the plaintiff has the burden of proving malice. Id. at 86-87(¶ 8).
¶ 67. Funderburk argues that she presented sufficient evidence that Ginger acted with malice to create a jury question. Funderburk argues that, at the time Ginger transmitted the proof of loss form to the insurance company, she had no proof that Funderburk "was responsible for any `missing' cash," and that Ginger blamed Funderburk in order to recover the $25,000 in insurance proceeds. She points to the testimony of her expert, Wilson, who reviewed the financial records and concluded that there was no evidence to support a claim that Funderburk stole money from the Tunica store. We find this evidence to be insufficient to enable the jury to conclude that Ginger submitted the proof of loss form with malice. When Ginger submitted the form, Funderburk had been indicted for embezzlement after the district attorney's office had conducted an independent investigation of the Tunica store's financial records. Though Funderburk does not bring this evidence to our attention, we recognize Funderburk's own testimony that Ginger told her to withhold cash from the daily deposits and that this cash was used as petty cash and diverted to the Clarksdale store. We find that this evidence, alone and without factual corroboration, was not a sufficient explanation for the whereabouts of the $285,546.42 to enable the jury to reach a reasonable and non-speculative conclusion that Ginger lied about her belief in Funderburk's dishonesty on the proof of loss form. We affirm the trial court's dismissal of the libel claim against Ginger based upon the qualified privilege.

F. Vicarious Liability.
¶ 68. Under the doctrine of respondeat superior, the master is liable for the tort of his servant committed within the scope of employment. Adams v. Cinemark USA, Inc., 831 So.2d 1156, 1159(¶ 9) (Miss.2002). Funderburk argues that Hyde Brothers was vicariously liable for the torts of Milton and Ginger since their tortious acts were committed within the course and scope of their employment as officers of Hyde Brothers. We note that the defendants have admitted that Milton and Ginger's act of filing the insurance claim was committed in the course and scope of their employment with Hyde Brothers and that Hyde Brothers would be vicariously liable if this act was tortious. *1107 Since we have concluded that Funderburk failed to present evidence sufficient to sustain a jury verdict on any of her tort claims against Milton and Ginger, Funderburk's claims against Hyde Brothers under the doctrine of respondeat superior also fail.

IV. THE TRIAL COURT ERRED IN PERMITTING THE DEFENDANT'S EXPERT TO TESTIFY AS TO HIS CONCLUSIONS WITHOUT HAVING FACTORED CRUCIAL INFORMATION INTO HIS TESTING AND ANALYSIS, WHICH CASTS DOUBT ON THE RELIABILITY OF THE EXPERT'S TESTING UNDER DAUBERT v. MERRELL DOW PHARMACEUTICALS, INC., 509 U.S. 579 (1993).
¶ 69. Defense expert Ralph Q. Summorford testified that he compared the amounts missing from the Tunica store's daily deposits with the amounts of cash deposited into Funderburk's checking account. From this information, he created a chart that was presented to the jury and showed the dates that the Tunica store's deposits were short of cash and the dates and amounts of Funderburk's cash deposits into her checking account. The chart showed that, on many of the days that the Tunica store experienced a cash shortage, Funderburk had deposited an amount of cash roughly corresponding to the Tunica store's cash shortage amount.
¶ 70. Prior to Summorford's testimony, Funderburk objected to the reliability of his conclusions pursuant to Mississippi Rule of Evidence 702. Funderburk argued that Summorford's testimony was unreliable since he admitted that he did not take into consideration that the cash deposits into Funderburk's account could have been attributable to her husband Marlin's deposit of the cash proceeds of his lawn care and firewood business, or to other sources. The trial court held that the issue of Marlin's cash deposits into the account from his businesses did not render Summorford's testimony unreliable and was a matter of weight, not admissibility. Accordingly, Funderburk cross-examined Summorford extensively about Marlin's cash deposits.
¶ 71. We review the trial court's decision admitting or excluding expert testimony for abuse of discretion. Mississippi Transportation Commission v. McLemore, 863 So.2d 31, 34(¶ 4) (Miss. 2003). We will affirm the trial court's decision "unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion." Id. Under Rule 702, a qualified expert witness may testify if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." This Court analyzes the admissibility of expert testimony under Rule 702 pursuant to the modified Daubert standard adopted in McLemore. McLemore, 863 So.2d at 39(¶ 23). The Daubert standard requires the trial court to act as a "gatekeeper" by performing a two-pronged inquiry into the admissibility of proffered expert testimony. Id. at 38(¶ 16). As the gatekeeper, the trial court must ascertain that the proffered testimony is both relevant and reliable, that is, that the testimony will assist the trier of fact. Id. The reliability analysis must focus on the "principles and methodology" underlying an expert opinion, not on the conclusions generated. Id. at 37(¶ 13). Generally, questions related to the bases and sources of an expert's opinion affect the weight to be afforded the opinion by the jury, not the admissibility of the opinion. U.S. v. 14.38 Acres of *1108 Land, More or Less Situated In Leflore County, 80 F.3d 1074, 1077 (5th Cir.1996).
¶ 72. This issue has been rendered moot by our finding from the evidence favoring Funderburk that there was insufficient evidence to support a jury verdict for Funderburk on any of her claims against Milton, Ginger, or Hyde Brothers. Nonetheless, we believe that the trial court did not abuse its discretion in concluding that the issue of Marlin's cash deposits went to weight rather than admissibility under Rule 702. Summorford's chart simply showed that cash deposits into Funderburk's account in amounts similar to the Tunica store's shortages were made on the same days that the Tunica store experienced the shortages. Summorford testified that there was "a correlation" between the Tunica shortages and the deposits into Funderburk's account. Summorford never opined that the evidence of the same-day cash deposits into Funderburk and Marlin's joint checking account meant that Funderburk had stolen cash from the Tunica store. Rather, Summorford's chart showing the temporal correlation between the missing cash and the cash deposits into Funderburk's account allowed the fact-finder to assess the evidence surrounding Funderburk's sources of cash and to reach its own conclusion as to the explanation for the cash deposits. The trial court did not abuse its discretion by admitting Summorford's testimony about the Tunica store's cash shortages and Funderburk's personal checking account upon a finding that the issue of other sources of Funderburk's cash income was a matter for the jury to weigh.
¶ 73. THE JUDGMENT OF THE CIRCUIT COURT OF TUNICA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. GRIFFIS, J. NOT PARTICIPATING.
NOTES
[1] After her employment with Hyde Brothers ended, Funderburk was married and changed her last name from "Hodge" to "Funderburk."
[2] The "Ending Cash" amount did not include $100 in cash that was used to make change and remained in the drawer at all times.
[3] There was testimony that, of this amount missing from the Tunica store, Howell and Watts concluded that the total cash collected but not deposited was $277,701.34.