**Charles LAWSON, Plaintiff,**

v.

**HEIDELBERG EASTERN,
d/b/a Plumrose, USA,
Inc., Defendant.**

No. 1:93CV243–S–D.

United States District Court,
N.D. Mississippi,
Eastern Division.

Jan. 10, 1995.

Jim Waide, Waide Law Office, Tupelo, MS, for plaintiff.

David R. Kresser, Fisher & Phillips, Atlanta, GA, Claude F. Clayton, Jr., Thomas Murry, Mitchell, McNutt, Threadgill, Smith & Sams, Tupelo, MS, for defendant.

## OPINION

SENTER, Chief Judge.

In this case, plaintiff charges that defendant is liable for intentional infliction of emotional distress and for a violation of the Mississippi actionable words statute in connection with an incident during which plaintiff was cursed by a managerial employee in the presence of a supervisor. This cause is presently before the court on defendant's motion for summary judgment. Defendant maintains that even accepting everything plaintiff says as true, it is entitled to summary dismissal of this cause as a matter of law.

## FACTS

### I.

The defendant, Plumrose USA, Inc., operates a meat packing plant in Booneville, Mississippi. The plaintiff, Charles Lawson, was employed by Plumrose as a box printer and worked at Plumrose from 1985 to May 28, 1993. At all pertinent times, Larry Wood was a purchasing manager for Plumrose but was not Lawson's supervisor. That position was held by Bill Eaton.

The events leading up to this action began on May 17, 1993, in the warehouse where Lawson printed the boxes. That morning, Wood received a load of film used in wrapping Plumrose's product and tried to store the shipment in Lawson's work area. When Lawson unsuccessfully complained to Wood that he did not have enough room in which to work, he turned to Eaton, his immediate supervisor, for help. In response to Eaton's

request that Wood give Lawson some work space, Wood, according to Lawson, exploded:

> And Larry Wood said, "This is my f-ing warehouse and I'll do anything I want to out here." But Bill Eaton said, "Well, Larry, he needs more room to work there." And I don't know exactly how the words come about, but anyway, he called me a sorry bastard, he said, he wished he would just fire the sorry son-of-a-bitch and "I wish he would move in with you." He was telling that to Bill Eaton.

> He called me a SOB three times. Like I said, I don't know exactly how it worked, but he called me a SOB. And I said, "Bill, he's called me a SOB three times now," and he said, "Yes, I know." And, see, he jumped down Bill Eaton's throat when Bill Eaton told him I needed more room to work. He said, "I wished they'd fire the sorry son-of-a-bitch and let him move in with you," and jumped down Bill Eaton's throat, and Bill didn't say nothing back to him. And we were standing there and he said—he said, "I'll blow your f-ing head off." And I said, "Larry, you mean you carry a gun?" and everybody laughed, you know.

> \*    \*    \*    \*    \*    \*

> And he said, "Come on, I'll take your damn ass outside and I'll stomp your ass in the pavement." So I started to go out with him and I said, "Bill, do I need to punch out?" And he said, "Yeah." And I said, "Will I lose my job?" And he said, "That's up to you." I went back to work.

This incident lasted approximately ten minutes; Lawson and Wood had no further contact that day. Lawson then went to the office of Soren Pedersen, the vice-president of production, and offered to take a "layoff" so that he could resign his employment but still collect unemployment compensation benefits. Lawson completed the workday and headed for Booneville City Hall, where he filed a criminal complaint for disorderly conduct against Wood, who was later found not guilty of the offense. He then went home without seeking any medical treatment.

The next day, Lawson and Wood discussed the criminal charges and Lawson's attempt

to have Wood jailed. According to Lawson, Wood called him an "asshole" and told him that he would have Lawson put in jail. Afterward, the two men had no more discussions that day, and Wood never pressed criminal charges against Lawson. Shortly thereafter, Lawson left work early to confer with an attorney and then meet with a judge.

Later that afternoon, Lawson presented himself to the emergency room at the Booneville Baptist Hospital to have his blood pressure checked. He also complained to the emergency room doctor that he was experiencing chest pains and dizziness. The doctor determined that Lawson's blood pressure was elevated but lowered it quickly through the use of medication. He nevertheless admitted Lawson to the hospital overnight and, following additional testing, released him the next morning. The doctor also gave Lawson a statement allowing him to remain off work until the following Monday, May 24.

On that date, Lawson returned to work and began training his replacement. Lawson and Wood had no conversations the entire week, the only contact between the two men being visual—on three or four occasions, Wood "stared [Lawson] down" with "that damned dirty look" as he walked through the warehouse. To Lawson, Wood "kept his eyes on [him] like he was trying to tell [him] something," making "sure [he] knowed he was out there."

On Friday, May 28, Lawson left work early and presented himself to the emergency room once again. The doctor gave Lawson some medication to lower his blood pressure and, according to Lawson, advised him not to return to work. He followed these instructions.

### II.

Pedersen did not allow Wood's conduct to go unpunished. On the day of the incident, May 17, he immediately began investigating the matter, interviewing Lawson, Eaton, Wood, and one other employee who was present during the altercation. Afterward, Pedersen was unable to determine exactly what had happened but nevertheless issued a reprimand to Wood for his part in the matter. That letter of reprimand, issued on May 24, bears repeating *in toto:*

On several occasions in the past, I have counselled you against publicly arguing and using profanity with employees.

On Monday, May 17, 1993, you were involved in a loud argument with Charles Lawson in the warehouse area that was heard by other employees and which included the extensive use of profanity. Mr. Lawson has told us he intends to see a lawyer over this incident.

While I do not believe that Mr. Lawson was blameless, your behavior is particularly inexcusable because you are the Purchasing Manager. I expect all of the managers who report to me to conduct themselves in a professional manner at all times, regardless of what a subordinate employee may do to incite them.

In the future, if you believe that an employee has violated Company Policy and that the employee does not report directly to you, you should first consult with the responsible supervisor before trying to counsel or reprimand the employee. If it is appropriate for you to counsel that employee directly, then you should always do so privately so that other employees are not aware that such counselling is taking place.

In counselling employees, there is *never* a good reason for you to use profanity. You should also not allow yourself to be drawn into an argument with a subordinate employee. If the employee tries to argue with you or will not accept your counselling, then you should report this to me, and we will take appropriate corrective action. You must understand that your behavior on Monday is not acceptable, and that any similar incidents in the future will result in disciplinary action that may include termination.

### III.

The May 17 incident was not the first in which Lawson and Wood had been involved. Approximately eight months earlier, Lawson had repeatedly complained about receiving poor quality boxes from a supplier. Finally, he took some defective boxes to the office of

the director of production. Wood was present and stated that Lawson should "quit bitching about them" and told the production director to "get this asshole out of here, or [he was] going to throw his ass out."

## DISCUSSION

### I. Intentional Infliction of Emotional Distress

■ An action for intentional infliction of emotional distress occurs "[w]here there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally ... the results being reasonably foreseeable ... even though there has been no physical injury." *Sears, Roebuck & Co. v. Devers*, 405 So.2d 898, 902 (Miss.1981). "[T]he contours of this 'outrage or revulsion' standard are not clearly defined in the Mississippi case law," *White v. Walker*, 950 F.2d 972, 978 (5th Cir.1991); however, "[d]ecisions rendered by the Supreme Court of Mississippi and federal courts sitting in diversity jurisdiction in the Magnolia state on intentional infliction of emotional distress claims consistently turn on whether a plaintiff satisfies the requisite elements set forth in the Restatement (Second) of Torts." *Jenkins v. City of Grenada*, 813 F.Supp. 443, 446 (N.D.Miss. 1993). Comment *d* to Section 46 offers the best explanation of this tort:

> One who by *extreme and outrageous conduct* intentionally and recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.... [G]enerally, the case is one in which the recitation of the fact *to an average member of the community* would arouse as a resentment against the actor, and lead him to exclaim, "outrageous." *The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.*

Restatement (Second) of Torts § 46 cmt. d (emphasis added). Furthermore,

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his

conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id.* See also *Burroughs v. FFP Operating Partners, L.P.*, 28 F.3d 543, 546 (5th Cir. 1994). "[I]t is the nature of the act itself—as opposed to the seriousness of the consequences—which gives impetus to legal redress." *Devers*, 405 So.2d at 902.

■ A claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes. *Jenkins*, 813 F.Supp. at 447. In a case in which a supervisor called subordinate employees "motherf-s" and told them to quit sitting on their "f-g asses," the Louisiana Supreme Court has stated:

> Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. Not every verbal encounter may be converted into a tort; on the contrary, "some safety valve must be left through which irascible tempers may blow off relatively harmless steam."

*White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La.1991) (citing Restatement (Second) of Torts § 46 comment *d*). "Thus, disciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable." *Monsanto*, 585 So.2d at 1210. "Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *Id.* See, e.g., *Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 654–55 (5th Cir.1994) ("Only in the most unusual cases does the conduct move out of the 'realm of an ordinary employment dispute' into the classification of 'extreme and outrageous,' as required for the tort of inten-

tional infliction of emotional distress"; court found sexually explicit and vulgar harassment of female employee which occurred on *daily* basis to be extreme and outrageous).

■ Applying these principles to the facts of this case, as viewed in the light most favorable to Lawson, the court finds that Lawson's claim of intentional infliction of emotional distress fails. Wood's "spontaneous, brief, intemperate outburst," *Monsanto*, 585 So.2d at 1211, was certainly improper, but the court believes that, as a matter of law, Wood's conduct was not "so extreme or outrageous as to go beyond all possible bounds of decency and to be regarded as utterly intolerable in a civilized community." *Id.* at 1211–12.

> Such conduct, although crude, rough and uncalled for, was not tortious.... The brief, isolated instance of improper behavior by [Wood,] who lost his temper[,] was the kind of unpleasant experience persons must expect to endure from time to time. The conduct was not more than a person of ordinary sensibilities can be expected to endure.

*Id.* at 1210–11. Although this was not the first time that the paths of Lawson and Wood had crossed, the two men did not have an on-going combative relationship sufficient to take this case outside the perimeters of an ordinary employment dispute. As there are no genuine issues of material fact, Plumrose having accepted Lawson's version of the incident as true and correct, and as Plumrose is entitled to judgment as a matter of law, its motion for summary judgment on the claim for intentional infliction of emotional distress is granted, and that claim is hereby dismissed.

## II. Violation of Actionable Words Statute

■ Mississippi's actionable words statute provides: "All words which, from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace, shall be actionable." Miss.Code Ann. § 95–1–1.

> The purpose of the statute is to allow a cause of action where there is usually a face-to-face encounter or where words are uttered to another in an insulting manner and which would precipitate an immediate, forceful and violent reaction by a reasonable person. They are words of a kind and nature spoken under such circumstances that their very utterance would reasonably tend to provoke a breach of the peace.

*Isaacks v. Reed,* 537 So.2d 409, 411 (Miss. 1988). A corporate employer cannot be held liable under this statute for the words of its employee:

> This section has no application in a suit to hold a principal liable for words spoken by an agent, unless possibly in a case where such words were spoken at the command of the principal.... Its language, together with the fact that its first appearance in our statutes was as section 9 of the "Act to suppress dueling" ... demonstrates that its enactment was for the purpose of preventing personal difficulties, and that, consequently, it applies only to persons liable to become involved in such a difficulty by reason of having referred to another in words of the character therein mentioned.

*Dixie Fire Insurance Co. v. Betty,* 101 Miss. 880, 58 So. 705, 705 (1912); *see also Milner Hotels v. Dougherty,* 195 Miss. 718, 15 So.2d 358, 359 (1943) (employer hotel held not liable under Actionable Words Statute where hotel manager "cursed and reviled" guest and his wife).

■ Lawson has been unable to come forward with any case law, besides that generally applicable in the master-servant relationship, that casts the *Dixie Fire* holding in doubt. Lawson cannot argue under the facts of this case that Wood's "words were spoken at the command of [Plumrose]," as it is undisputed that Plumrose forcefully reprimanded Wood for his conduct in the matter. Plumrose is therefore entitled to summary dismissal of this claim as well.

## CONCLUSION

Having carefully considered the matter, the court finds that the motion of the defendant, Plumrose, USA, Inc., is well taken and

is granted. This cause is hereby dismissed with prejudice.