# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CT-00455-SCT

*PETESY SMITH*

*v.*

*TAMMY WHITE*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/1999 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES R. WILBANKS, JR. |
| | KIMBERLY PINE TURNER |
| | BARRY C. CAMPBELL |
| ATTORNEY FOR APPELLEE: | ROBERT H. PEDERSEN |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND REMANDED - 10/25/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/15/2001 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Petesy Smith in this defamation case raises questions concerning slander per se, qualified privilege and malice. The jury answered most of these questions in favor of the plaintiff Petesy Smith, however neither Smith nor the defendant Tammy White was satisfied with the jury verdict, and both appealed. The Court of Appeals found that the jury's verdict in favor of Smith was not justified and rendered judgment in favor of White. We granted certiorari, and after consideration we find that the judgment of the Court of Appeals should be reversed. We further find that the jury's verdict should be reinstated, and the matter remanded to the Warren County Circuit Court for further proceedings.

## FACTS

¶2. The following statement of facts is taken from the opinion of the Court of Appeals:

[Petesy] Smith has a long history of service as a volunteer in various organizations involved in protecting children's well-being. One such activity was her work as a volunteer child advocate in the Child Advocate Program (CAP), an organization funded through private grants, donations, fund-raisers, and grants from state and local governmental organizations. Under that program, volunteers agreed to serve, on a case-by-case basis, as "advocates" for children involved in Youth Court

proceedings or coming under the purview of the Department of Human Services (DHS), in the hope that these volunteers can provide a helpful but dispassionate voice in any such proceeding on the child's behalf. In addition to her duties as a child advocate in the CAP program, Smith also served as local chairperson for an unrelated organization known as the Warren County Family Advocacy Committee. Her duties in that position were more general, since the focus of that organization's mission was to seek systemic changes in the treatment of children coming under the eye of public authorities rather than undertaking to intervene in a particular child's case. The proof is uncontradicted that, in her role as chairperson for the Warren County Family Advocacy Committee, Smith was at times critical of the operation of the local DHS, and was, in fact, often quite outspoken in her criticism.

[Tammy] White served as director for the Child Advocate Program (CAP) and, in that capacity, was responsible for supervising all volunteer child advocates. After being shown information by an employee of DHS that indicated that Smith was representing herself as the designated advocate in a particular child's case when, in fact, she was not, White returned to CAP offices and had a conversation about the matter with Walley Flowers, who was at the time acting as president for CAP. The conversation turned to the question of how a form generated in the CAP offices that had made its way into a DHS file could incorrectly show Smith as the designated advocate for this particular child. White called in Angela Carpenter, who worked as a clerical employee for CAP, and requested that she pull the file in order to investigate the matter further. During the course of the conversation, White speculated aloud as to how Smith's name could have gotten into the file as the child's advocate and remarked that Smith did have a key to the offices. However, immediately upon the file being pulled, it was discovered that another volunteer performing clerical duties had mistakenly listed Smith on the form in question as the child's designated advocate.

Nevertheless, because of other concerns regarding Smith's activities in her dual roles, White testified that she had become convinced that it was not in the best interest of CAP for Smith to continue acting as volunteer advocate. White expressed two basic concerns in her decision to sever Smith's participation. First, she expressed concern that Smith's open criticism of local DHS employees' performance could hamper her ability to work closely with those same DHS employees as an advocate on behalf of a particular child. Secondly, she was concerned that Smith would have the opportunity to use information gained while serving as a child advocate as evidence to support her general complaints against the local DHS that she was making at the state level.

After her decision to end Smith's participation as a child advocate volunteer, there was a meeting of the CAP Executive Committee to discuss White's decision. White informed those present of the circumstances surrounding her decision and, in the course of reporting the facts, informed the members of her remark to Walley Flowers about Smith having a key to the CAP offices. At that same meeting, White distributed to all present a written summary of her recollection of the critical events, which included a complete recitation of the facts as to how Smith's name had incorrectly but inadvertently been listed as the designated advocate for the particular child in question.

. . . .

The trial court, after hearing the evidence, determined that all of White's statements were made in the course of her official duties as director of CAP and were made to others engaged in their capacity as executive committee members. As such, the trial court ruled as a matter of law that White's statements

were subject to a qualified privilege that shielded White from liability for her statements unless Smith could prove that the statements were made with malice. The jury was instructed accordingly and returned a verdict for Smith in the amount of $5,000 plus court costs of $1,565.06.

*Smith v. White*, No. 1999-CA-00455-COA ¶¶ 4-7, 13 (Miss. Ct. App. Jan. 9, 2001).

¶3. Petesy Smith appealed from the circuit court judgment, and Tammy White cross-appealed. The Court of Appeals, in a 7-1 decision, with two Judges not participating, reversed and rendered. The Court of Appeals found that Tammy White, as CAP director, had a qualified privilege to make the remarks that she made. The Court of Appeals next found that White's remark that Smith had a key to the CAP offices was not slanderous because, first, it was true, and second, there was insufficient evidence to show that the remark was intended to impute a criminal act to Smith or that it was capable of being understood and was understood by those who heard it to charge Smith with committing a criminal act. The Court of Appeals finally found that there was insufficient evidence to show that Smith was defamed by remarks by White to the effect that Smith's criticism of the DHS could harm her ability to work with the DHS social worker that might be assigned to a child that Smith was concerned with.

¶4. On certiorari Petesy Smith argues that the statements in question were not subject to a qualified privilege, that the statements were slanderous per se and that the jury's finding of malice on behalf Tammy White required the issue of punitive damages to be submitted to the jury.

## DISCUSSION

### I. The COA erred in substituting its judgment for the judgment of the circuit court and jury.

¶5. Petesy Smith first cites several cases, including *Long v. Harris*, 744 So.2d 839 (Miss. Ct. App. 1999); *Downtown Grill, Inc. v. Connell*, 721 So.2d 1113 (Miss. 1998); *Sessums v. Northtown Limousines, Inc.,* 664 So.2d 164 (Miss. 1995); *Straight v. Brinson*, 246 So.2d 132, 149 So.2d 515 (1963); and *New Orleans & Northeastern R. Co. v. Lewis*, 214 Miss. 163, 58 So.2d 486 (1952), for the standard of review for a jury verdict, for the deference an appellate court must give to a jury verdict, and for proposition that a jury decides fact questions and its decision on this should be upheld, and that the reviewing court may not reverse a jury verdict merely because it disagrees with the verdict. Petesy Smith argues that the Court of Appeals erred in reversing the jury verdict in her favor because of its finding that her case did not meet the standards as presented in the cases listed above.

¶6. The Court of Appeals rejected Petesy Smith's argument that the statements in question constituted slander per se. This Court agrees in light of the recent decision in *Speed v. Scott*, 787 So.2d 626 (Miss. 2001). As this Court stated in *Speed*, it is not enough that an act could be penalized under a criminal code. Rather, the crime must be one involving moral turpitude, which has been defined as "inherent baseness or vileness of principle in the human heart . . . shameful wickedness, so extreme a departure from ordinary standards of honesty, good morals, justice or ethics as to be shocking to the moral sense of the community." *Speed*, 787 So.2d at 633. As this Court found in *Speed*, the act here alleged does not rise to such a level.

¶7. As for the existence of a qualified privilege, this Court provided the following in *Louisiana Oil Corp. v. Renno*, 173 Miss. 609, 618-19, 157 So. 705, 708 (1934):

A communication made in good faith and on a subject-matter in which the person making it has an

interest, or in reference to which he has a duty, is privileged if made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous, provided the statement is made without malice and in good faith.

¶8. We find that the qualified privilege applies to Tammy White, in her position as CAP director, in this case. Because of this qualified privilege Petesy Smith was required to prove malice on behalf of Tammy White as to the statements in question. The Court of Appeals found that the evidence of malice was insufficient to support the verdict in favor of Petesy Smith. We disagree.

¶9. This Court has explained that by "actual malice," it is meant that at the time the comments were published, the speaker either knew them to be false or made them in reckless disregard of their truth. *Speed*, 787 So.2d at 631. It is clear from Tammy White's own testimony that at the time White made the statement(s) to the executive board regarding Smith's possession of a key to the Center, she knew for a fact that Smith had done nothing inappropriate to have her name listed on the CAP form as designated advocate, and more importantly that Smith had not used the key to enter the Center and put her name on the form.

¶10. The testimony regarding White's statement to the board about Smith's possession of a key is inconsistent. White testified that in making the statement, she was merely recounting to the board the chain of events which occurred regarding how Smith's name came to be on the form. White testified that she told the board that she had checked the file and determined that a clerical error was the cause and that the possibility that Smith had used the key to gain inappropriate access was not true. Though White circulated a memo to the board stating that Smith's name came to be on the form because of a clerical error, persons present at the meeting testified that White never told them that the possibility of Smith using the key to gain inappropriate access to the file was not an option to be considered.

¶11. Three persons present at the meeting testified that the statement about the key was made in the context of the board's discussing the different possibilities of how Smith's name came to be listed on the form. James Wilkerson testified that White, in discussing the different possibilities of how Smith's name appeared on the form, speculated that Smith could have used the key to get information from the Center. Smith testified that after the meeting Don Brown told her White had accused her of using her key to break into the office. Brown denied this. Brown, who first testified that the fact that Smith had a key was discussed as an option as to how her name came to be on the form, later testified that the statement was made in jest.

¶12. Clearly, evidence was before the jury that White discussed the possibility that Smith had used her key to the Center to have her name listed on the form when White already knew, for a fact, that Smith's name came to be on the form because of a clerical error. Admittedly, the evidence was disputed, often within the testimony of single witnesses. Still, the credibility of a witness is a question for the jury. In light of the standard of review on appeal, which requires this Court to give Smith the benefit of all favorable inferences that reasonably may be drawn from the evidence, we find that the Court of Appeals erred in its determination that there was insufficient evidence to support the jury's determination that White had made the defamatory statement with malice.

¶13. The Court of Appeals held that Smith failed to show that the persons to whom the statements were published considered them to be slanderous. We find that Smith was not required to show that the persons to whom the statements were published considered them to be defamatory.

¶14. This Court stated in *Montgomery Ward & Co. v. Skinner*, 200 Miss. 44, 66, 25 So. 2d 572, 578 (1946), that "where a slanderous charge is made in plain and ordinary language, and not ambiguous as to its slanderous aspect, it is the judgment of the jury, and not that of the hearers of the words, that must determine whether or not they are slanderous. . . ." The Court of Appeals determined that White's remark that Smith possessed a key to the Center is capable of more than one interpretation, one of which is not slanderous. Regarding the possible non-slanderous interpretation of the statement, the Court of Appeals explained that "the first time the statement was made was when the investigation of the matter was in its earliest stages and could easily have been interpreted as nothing more than a mention of a possibility that should be explored, rather than a direct accusation of criminal activity." *Smith* at ¶ 21. This determination misses the mark. First, it is clear from the record that by the second time the statement was made, the possibility was not one to be explored. Furthermore, possibility or not, White's statement regarding the key could not be interpreted in any way other than that alleged by Smith - that is, that Smith had a key to the Center and could have used it to gain access to the Center's files - particularly in light of the context in which the statement occurred. Smith was not required to demonstrate that the hearers viewed the statement as defamatory.

¶15. As the judgment of the circuit court in favor of Petesy Smith is being reinstated, this leaves the question of whether the trial court should have allowed the issue of punitive damages to have been considered by the jury. The jury in this case was instructed that it could only find in favor of Petesy Smith if it found that Tammy White acted with malice. Its finding in favor of Petesy Smith necessarily included a finding of malice. As White acted with malice, the question of punitive damages should have been submitted to the jury. *See Lawrence v. Virginia Ins. Reciprocal*, 979 F.2d 1053, 1057 (5th Cir. 1992).

## CONCLUSION

¶16. Tammy White's statements were not slanderous per se, and the qualified privilege was applicable to those statements unless they were made with malice. Because we agree that the evidence is sufficient to support the jury's finding that the statements were made with malice, the judgment of the Court of Appeals is reversed, the jury's verdict in favor of Petesy Smith is reinstated, and this matter is remanded to the circuit court for submission of the issue of punitive damages to a new jury.

¶17. **JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE VERDICT IN FAVOR OF PETESY SMITH IS REINSTATED AND THE MATTER IS REMANDED TO THE WARREN COUNTY CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

> **BANKS AND McRAE, P.JJ., MILLS, COBB, DIAZ AND EASLEY, JJ., CONCUR. WALLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J.**

> **WALLER, JUSTICE, DISSENTING:**

¶18. To meet the *New York Times* standard for actual malice, the falsehood must be *substantial*. *Masson v. New Yorker Magazine*, 501 U.S. 496, 527, 111 S. Ct. 2419, 2438, 115 L. Ed. 2d 447 (1991) (White, J., dissenting). The Supreme Court has accorded public figures as well as public officials recovery of damages for the publication of "defamatory falsehood whose *substance makes substantial danger to reputation apparent*, on a showing of highly unreasonable conduct constituting an extreme

departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S. Ct. 1975, 1991, 18 L. Ed. 2d 1094 (1967) (emphasis added).

¶19. In the case presently on review, White's audience understood that the story about Smith having an office key was merely part of how White conducted the investigation into why Smith's name was erroneously placed in the case file. White's statements did not make "substantial danger to [Smith's] reputation apparent," and simply do not constitute actual malice. I see this controversy between White and Smith as nothing more than what was before us in *Speed v. Scott*, 787 So. 2d 626 (Miss. 2001).

¶20. I therefore dissent and would affirm the Court of Appeals' findings.

**PITTMAN, C.J., JOINS THIS OPINION.**