# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00639-COA

WILLIAM "BILL" HAYS                                                    APPELLANT

v.

WILLIAM LAFORGE                                                          APPELLEE

DATE OF JUDGMENT:            04/24/2020
TRIAL JUDGE:                 HON. CHARLES E. WEBSTER
COURT FROM WHICH APPEALED:   BOLIVAR COUNTY CIRCUIT COURT,
                             SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      RONALD W. LEWIS
ATTORNEYS FOR APPELLEE:      J. CAL MAYO JR.
                             SARAH KATHERINE EMBRY
NATURE OF THE CASE:          CIVIL - TORTS - OTHER THAN PERSONAL
                             INJURY & PROPERTY DAMAGE
DISPOSITION:                 AFFIRMED - 01/11/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.     This matter arose from Delta State University's decision not to reappoint Appellant

William "Bill" Hays as chair of the University's languages and literature division (L&L

division) in May 2014. A controversy developed due to Hays's non-reappointment and

intensified over the next three months. University administration, including Appellee William

LaForge, the president of the University, believed Hays encouraged this controversy.

Because the University believed that the controversy threatened to undermine effective

university and division operations, President LaForge appeared at a division faculty meeting

on August 15, 2014, at the request of the provost and division chair. He addressed the

faculty, including Hays specifically, in forceful (and what may be considered harsh) terms, demanding that the counterproductive behavior relating to Hays's non-reappointment stop.

¶2. Hays sued President LaForge based upon statements he made at his August 15, 2014 address to the L&L division faculty and comments arising from that address, seeking relief for slander, slander per se, "false light" invasion of privacy, and intentional infliction of emotional distress. The Circuit Court of Bolivar County, Second Judicial District, granted summary judgment in President LaForge's favor. The trial court found that qualified privilege barred Hays's claims because Hays had failed to present evidence sufficient to create a genuine issue of material fact that President LaForge acted with actual malice in this case.

¶3. Hays's sole contention on appeal is that he did present sufficient proof to create a genuine issue of material fact that President LaForge acted with actual malice when he addressed the L&L division on August 15, 2014, and in comments arising from that address. For the reasons addressed below, we affirm the grant of summary judgment in President LaForge's favor and dismissal of Hays's civil action, with prejudice.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

#### I.     Statement of Facts

¶4. This matter involves a dispute between Hays, a former English professor at Delta State University, and President LaForge. The University employed Hays as an English professor for thirty-three years, beginning in August 1981. In 2006, Hays also accepted an

administrative appointment as chair of the L&L division. He executed an employment contract for that position. The employment contract provided that "[b]y signing this [contract] you . . . agree that you have no property interest in the administrative position named above, serve at the will and pleasure of the university[,] and may be removed from this administrative position at any time, with or without cause."

¶5. Interim Dean Paul Hankins, Provost Charles McAdams, and President LaForge did not reappoint Hays as division chair for the term beginning July 1, 2014. Dean Hankins notified Hays of the decision in a letter to him dated May 22, 2014. Dean Hankins named Don Allan "Chip" Mitchell to serve as interim division chair.

¶6. A campus and community-wide controversy began after Hays was not reappointed as division chair. Efforts were made by various persons in an attempt to have the University reverse its decision, including a "Reinstate Bill Hays" community Facebook page created by two graduate students and a recent alumnus. According to the affidavit of one of its creators, the Facebook page was created to "use it as a platform to encourage people to write letters of support for Dr. Hays to President LaForge," and all three administrators of the Facebook page stated in their affidavits that Hays was not involved in "suggestions or submissions to be posted on the site." A letter and e-mail campaign also took place, as well as the wearing of T-shirts containing slogans in support of Hays. The University did not change its decision.

¶7. The University, including President LaForge, believed that Hays encouraged and participated in the controversy. The record contains emails between Hays and community

3

members, former and current faculty members, and graduate students and alumni; affidavits of faculty members and others; and deposition testimony of Hays and other witnesses showing Hays's participation in the controversy. These include over forty emails from Hays to one of the Facebook site administrators regarding the reinstatement campaign and communications from Hays to April Stewart, who featured cartoons on the Facebook site that were aimed at poking fun at members of the University's administration and the interim chair.[1] The record reflects that President LaForge knew about the "Reinstate Bill Hays" Facebook campaign and unflattering cartoons left with Dean Hankins and Interim Chair Mitchell; and LaForge received dozens of emails from students, faculty, alumni, and community members opposing the decision not to reappoint Hays as division chair.

¶8. The record also reflects that President LaForge received reports of Hays's "unprofessional behavior among [his] colleagues" following Hays's non-reappointment. President LaForge explained in his deposition that this behavior "seemed to percolate up and got worse from June to July [2014]." He received these reports from Interim Chair Mitchell, as well as Provost McAdams, Vice President for University Relations Michelle Roberts, and Dean Hankins. LaForge was also forwarded and reviewed emails from Hays to the L&L division relating to the reinstatement campaign.

¶9. In his affidavit, Provost McAdams said that he periodically "met with President

---

[1] To avoid repetition, details regarding the events taking place after Hays was not reappointed as division chair are discussed below as necessary.

LaForge [and] informed him of the deteriorating climate in the Division as a result of the Hays controversy," including specific incidents of "faculty disruptions," "disrespect for the Interim Chair," and "[t]he involvement of students in the Hays controversy." Provost McAdams believed that the "Hays controversy was affecting the academy and distracting from the University's mission," so in August he "asked President LaForge to address the entire division and to communicate to them that 'enough is enough.'" President LaForge did so on August 15, 2014, appearing at an L&L division faculty meeting and addressing those present, including Hays.

¶10. As described by the trial court in its order granting summary judgment in President LaForge's favor, his comments to the L&L division "were in a direct and what might be considered a harsh tone . . . aimed at the perceived disruption of normal collegiate life at the university and the extent, if any, to which Hays and perhaps others purportedly contributed to this disruption." In his address, for example, President LaForge explained to the division:

> There is a pattern in this division of belligerence, of rudeness, really unprofessional behavior . . . . [N]ot all of you. Some of you are involved with it, some of you caused it, and some of you enabled it. And you let it go on too long and it's going to stop. I am putting you on notice today that that type of behavior toward the Dean, toward the Provost, toward each other, toward your Interim Chair, no matter what your beliefs about anything that has happened in terms of the changeover in chair. None of that's going to be tolerated anymore.

Continuing, President LaForge told the group, "[A]ll the stuff that has gone on in the last three months, . . . enough is enough. I'm just not going to put up with it anymore." Speaking directly to Hays, President LaForge said, "Bill Hays, I am telling you to stand down . . . .

5

You and your colleagues are going to be held accountable. The attitudes, the bad behavior, the passive aggressiveness related to your contract non-renewal have infected this division to the point where it's toxic and it's untenable. It's unprofessional." A transcript and an audio recording of President LaForge's address are part of the record, and his statements in that address will be addressed in further detail, as necessary, below. Hays also takes issue with purported "attacks" against him by President LaForge relating to the August 15, 2014 address that occurred in the following days and other events occurring in the following months. These communications and incidents will be discussed in context, as necessary, below.

¶11. Hays retired from the University in December 2015.

## II. Procedural History

¶12. Hays filed this action in the Bolivar County Circuit Court on November 13, 2015, and filed his amended complaint on March 14, 2016,[2] seeking to recover from President LaForge for slander, slander per se, false light invasion of privacy, and intentional infliction of emotional distress based primarily on statements President LaForge made in his August 15,

---

[2] Before filing his state-court complaint, Hays sued LaForge in federal court, asserting "a federal claim for First Amendment free speech retaliation under 42 U.S.C. § 1983 against [President LaForge] in his official capacity and state law claims for slander, slander per se, false light invasion of privacy, and intentional infliction of emotional distress against [LaForge] in his individual capacity." *Hays v. LaForge*, 113 F. Supp. 3d 883, 888 (N.D. Miss. 2015). The district court dismissed Hays's First Amendment claim and declined to exercise jurisdiction over the state-law claims. *Id.* at 907.

2014 address to L&L division faculty.[3]

¶13.    President LaForge subsequently answered and then moved for summary judgment on December 27, 2017, requesting that the trial court enter judgment in his favor because (1) the alleged defamatory statements are not actionable as a matter of law; (2) Hays, a vortex public figure, cannot prove actual malice by clear and convincing evidence; (3) qualified immunity bars Hays's claims; and (4) no sufficient evidence exists to support Hays's claims of false light invasion of privacy or intentional infliction of emotional distress.

¶14.    After a hearing, the trial court granted President LaForge's motion on April 24, 2020, concluding that qualified privilege bars all of Hays's claims.  In particular, the trial court found that Hays had failed to present evidence that President LaForge exceeded the scope of that privilege or acted with actual malice in this case.  Hays filed a "Motion for Relief from Judgment or to Alter or Amend Judgment" under Mississippi Rules of Civil Procedure 60(b)(2) and 60(b)(6) and Rule 59(e), which the trial court denied on June 4, 2020.  Hays appealed.

**STANDARD OF REVIEW**

¶15.    "This Court employs a de novo standard in reviewing a trial court's grant of summary

_____

[3] In his amended complaint, Hays also alleged, in support of his intentional infliction of emotional distress claim, that "[s]ubsequently [(after the August 15, 2014 address)], Defendant LaForge used a public speaking opportunity, as well as an email copied to numerous administrators, to blame and to ridicule Hays by name without basis whenever questions arose about the appropriateness of cuts to DSU's academic programs."  No other specific information was included in the amended complaint, and no "email" was attached in support of Hays's allegations concerning LaForge's post-August 2014 statements.

judgment." *Noxubee Cnty. Sch. Dist. v. United Nat'l Ins. Co.*, 883 So. 2d 1159, 1163 (¶6) (Miss. 2004). Mississippi Rule of Civil Procedure 56(c) provides that "[t]he judgment sought shall be rendered . . . if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In this regard, the evidence presented "must be viewed in the light most favorable to the party against whom the motion for summary judgment has been made." *Noxubee Cnty. Sch. Dist.*, 883 So. 2d at 1163 (¶6). Nevertheless, "[t]o withstand summary judgment, the nonmoving party must produce significant probative evidence of a genuine issue for trial." *Faul v. Perlman*, 104 So. 3d 148, 152 (¶11) (Miss. Ct. App. 2012). "[A]n appellate court may affirm a trial court if the correct result is reached, even if the trial court reached the result for a different reason." *Davis v. City of Jackson*, 240 So. 3d 381, 384 (¶13) (Miss. 2018).

## DISCUSSION

### I.    Defamation[4]

¶16.    Hays asserts that he presented sufficient proof of actual malice on President LaForge's part to create a genuine issue of material fact on this requisite element of his defamation claim. Based upon our review of the record, including the transcript of President LaForge's August 15, 2014 address to the L&L division, we find Hays's assertions are without merit.

---

[4] Oral defamation is slander. *See Defamation*, Black's Law Dictionary at 525 (11th ed. 2019). We collectively refer to Hays's slander and slander per se claims as his "defamation claim" throughout.

8

We begin with an overview of the applicable law.

¶17. The Mississippi Supreme Court explained in *Simmons Law Group P.A. v. Corporate Management Inc*., 42 So. 3d 511, 517 (¶10) (Miss. 2010), that a plaintiff must prove the following to establish defamation:

(1)     a false and defamatory statement concerning the plaintiff;

(2)     an *unprivileged* publication to a third party;

(3)     fault amounting at least to negligence on the part of the publisher; and

(4)     either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

(Emphasis added).

### A.     Qualified Immunity

¶18. "When analyzing defamation claims, Mississippi courts employ a bifurcated process." *Barmada v. Pridjian*, 989 So. 2d 359, 362 (¶9) (Miss. 2008).  The trial court must first "determine whether the occasion calls for a qualified privilege[;] [if the court finds that] a qualified privilege does exist, the [c]ourt must then determine whether the privilege is overcome by malice, bad faith, or abuse." *Id.* (citation omitted).

¶19. A qualified privilege for communications between persons with a common interest in a subject matter exists under Mississippi law, as follows:

A communication made in good faith and on a subject matter in which the person making it has an interest, or in reference to which he has a duty, is privileged if made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous, provided the statement is made without malice and in good faith.

9

*Eckman v. Cooper Tire & Rubber Co.*, 893 So. 2d 1049, 1052 (¶9) (Miss. 2005). "Where qualified privilege exists, a presumption of good faith arises. . . . A plaintiff must present affirmative evidence demonstrating actual malice to defeat the qualified privilege." *Barmada*, 989 So. 2d at 364 (¶17) (citing *Eckman*, 893 So. 2d at 1054 (¶14)); *S. Health Corp. of Houston v. Crausby*, 174 So. 3d 916, 921 (¶20) (Miss. Ct. App. 2015).

¶20.    Hays specifically states in his brief that he "has conceded under the facts of this case, i.e., Laforge addressing his faculty, a qualified privilege did exist." Independently of this concession, we find, like the trial court, that a qualified privilege applies in this case with respect to President LaForge's statements to the L&L division on August 15, 2014, and his statements arising from that address. *See Staheli v. Smith*, 548 So. 2d 1299, 1305 (Miss. 1989) (finding qualified privilege protected communications between college dean and faculty senate concerning plaintiff professor's tenure application); *see also Beauchene v. Miss. Coll.*, 986 F. Supp. 2d 755, 766 (S.D. Miss. 2013) (finding qualified privilege protected communications among faculty members concerning plaintiff law student's compliance with academic standards without resorting to plagiarism) (citing *Smith v. White*, 799 So. 2d 83, 86 (¶7) (Miss. 2001)).

¶21.    As noted, to overcome the presumption of good faith, Hays must show that President LaForge made the statements in question with actual malice. *Barmada*, 989 So. 2d at 364 (¶17). "Actual malice means that 'at the time the comments were published, the speaker either knew them to be false or made them in reckless disregard of their truth.'" *Crausby*,

10

174 So. 3d at 921 (¶20) (quoting *Smith*, 799 So. 2d at 87 (¶9)). "[A] person's ill will or personal spite will not, standing alone, support a finding of actual malice." *Franklin v. Thompson*, 722 So. 2d 688, 693 (¶15) (Miss. 1998). Rather, "the evidence must show that [the defendant] made a false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication." *Id.* (citations and internal quotation marks omitted). In this regard, "[t]he proof of malice must . . . be clear. It is not sufficient 'that the evidence be consistent with the existence of actual malice, or even that it raise a suspicion that the defendant might have been actuated by malice or a doubt as to his good faith.'" *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380, 389 (5th Cir. 1987) (quoting *Hayden v. Foryt*, 407 So. 2d 535, 539 (Miss. 1981)). Hays "must affirmatively prove the existence of actual malice, and to do so it must be more consistent with the existence of actual malice than with its nonexistence." *Hayden*, 407 So. 2d at 539.

¶22. We also recognize that in determining whether any statement is actionable, Hays bears the burden of proving a statement's falsity. *Jernigan v. Humphrey*, 815 So. 2d 1149, 1153 (¶14) (Miss. 2002). Further, the Court must consider "[t]he said-to-be-offending words . . . in the context of the entire utterance. Their complexion draws color from the whole." *Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990). "The defamation must be unmistakable from the words and not be the product of innuendo, speculation[,] or conjecture." *Id.* "[N]othing in life or our law guarantees a person immunity from occasional sharp criticism, nor should it; mere "unfair" statements and "caustic commentary" are

11

"simply not actionable [as defamation]." *Ferguson v. Watkins*, 448 So. 2d 271, 276 (Miss. 1984); *see Johnson v. Delta-Democrat Pub. Co.*, 531 So. 2d 811, 814 (Miss. 1988) ("[N]ame calling and verbal abuse are to be taken as statements of opinion, not fact, and therefore will not give rise to an action for [defamation].").

¶23.    With these principles in mind, we address the circumstances leading up to President LaForge's August 15, 2014 address and the statements and instances Hays asserts demonstrate that he has shown to be sufficient proof of actual malice.

### B.    The Circumstances Leading up to President LaForge's August 15, 2014 Address

¶24.    The record contains extensive evidence that President LaForge knew about the "Reinstate Bill Hays" campaign, Hays's conduct relating to that campaign, and Hays's conduct within the L&L division.  Such evidence includes over one hundred pages of emails to LaForge from Interim Chair Mitchell, as well as Provost McAdams, Vice President for University Relations Michelle Roberts, and Interim Dean Hankins.  These emails contain reports describing unprofessional and disruptive behavior stemming from Hays's attitude and his reinstatement campaign between May 22, 2014, and into August 2014.  President LaForge was also forwarded and reviewed emails from Hays to the L&L division relating to the reinstatement campaign.

¶25.    In his deposition, President LaForge described the basis for his knowledge:

> From the reports from those who are my officials on campus who reported to me I'd heard of the terrible behavior in the division and the rudeness and the other things, unprofessional behavior among colleagues, and it seemed to

12

percolate up and got worse from June to July. And I came to the point where I said enough is enough, and I called this meeting with the recommendation of my Provost, of course.

¶26. Similarly, as Provost McAdams explained in his affidavit, "[b]etween May 22 and August 15, I periodically met with President LaForge. I informed him of the deteriorating climate in the Division as a result of the Hays controversy," and "as Provost and VP for Academic Affairs," Provost McAdams told President LaForge about his particular concern for "[t]he involvement of students in the Hays controversy." Provost McAdams told President LaForge that "Hays or his supporters involved and used students as a tool in the campaign to reverse the Chair decision. Students wrote letters and personally came to visit me [(McAdams)] about the administrative decision that should not have affected them." Continuing, Provost McAdams stated that "[t]he Hays controversy was affecting the academy and distracting from the University's mission. I was concerned that more students would be brought into the controversy during the fall semester." Based upon his concerns that he had discussed with President LaForge, Provost McAdams asked President LaForge to address the entire L&L division and to communicate to them that "enough is enough."

¶27. President LaForge accepted Provost McAdam's request, and his response evidences President LaForge's belief that such action was necessary:

> After a great deal of thought AND in light of continuing unfolding events, I accept your offer/suggestion for us to meet with Chip and the L&L Division this Friday afternoon. The manipulation of Chip by Bill Hays has reached a new level. I have reached my limit and I know you have as well. I agree completely that we need to meet with them and tell BH and his sycophants that "enough is enough." We need to put them on collective notice that their

13

behavior is totally unacceptable.

¶28. The record also reflects that before the August 15 division meeting, Provost McAdams gave President LaForge a list of "Talking Points for L&L Meeting," which stated the purposes for the meeting; namely, to "clear the air" and "[e]stablish expected professional behavior." Among other points, Provost McAdams identified the following "talking points":

• There has been a pattern of belligerent, rude, and totally unprofessional behavior by some of the faculty in L&L.

• Individuals, including senior faculty, are put on notice that this type of behavior to each other, to the chair, dean and others will not be tolerated.

• Manipulating students to "take sides" in a [personnel] issue is totally unprofessional and will be considered an act of academic misconduct.

• Pursuing a "scorched earth" policy is NOT consistent with DSU policies on Work Performance and Code of Conduct . . . NOR is it consistent with the Expectations of Faculty stated in the Faculty "Rights and Responsibilities" Policy . . . .

• Chip Mitchell did not ask for, nor did he seek this position.

• Chip did not create the problems with faculty credentials and qualifications—he inherited [them].

¶29. With this backdrop, we examine the statements and instances that Hays relies upon in asserting that President LaForge acted with "actual malice" in this case.

### C. The Alleged Defamatory Statements

¶30. Hays describes four instances that he asserts "reveal LaForge's animus towards Hays" and generally references the "facts" section of his brief in which he describes other statements or instances that he apparently claims demonstrate "actual malice" on President

14

LaForge's part.

¶31. First, Hays asserts that LaForge accused him during the August 15 address "of poisoning his students' minds" in connection with the Reinstate Bill Hays Facebook page. Hays points to the affidavits of the three administrators of the Facebook site in which these individuals state that Hays was not involved in "suggestions or submissions to be posted on the site." According to Hays, "Laforge easily could have determined the truth by a private meeting with Hays or by asking Hays's Dean to inquire." We find that his use of the term "poisoning" the students' minds, though caustic, does not amount to actionable defamation, particularly in light of the reports President LaForge had received from Provost McAdams, Interim Chair Mitchell, and other administrators. In any event, we have reviewed ample evidence in the record showing that Hays did enable and encourage the Facebook campaign.

¶32. More importantly, our review of the address transcript shows that President LaForge did not accuse Hays of participating in the Facebook page during the August 2014 division meeting. Rather, President LaForge said:

> To write Facebook pages. I don't care, it doesn't bother me. I'm tolerant of that kind of stuff. Whether you did it or not, somebody enabled that. Somebody gave them the information from this Division, whether it was you, Bill, or whether it was someone else. *I'm not accusing you*, because at this point I really don't care what happened. This is all about going forward. It's not going to be tolerated.

(Emphasis added).

¶33. With respect to Hays's second example of purported actual malice on President LaForge's part, Hays mistakenly attributes Interim Chair Mitchell's email heading "He

15

doesn't deserve a graceful exit" to President LaForge. This is not evidence attributable to President LaForge at all.

¶34. As for Hays's third and fourth instances purportedly evidencing President LaForge's actual malice, Hays points to the denial of his emeritus application years after President LaForge's address to the L&L division and a statement by President LaForge to Provost McAdams on December 18, 2015, that "his [(Hays's)] departure is even more ignominious than even I predicted" in response to Provost McAdams's email detailing issues related to Hays's exit. Neither of these instances, however, have any bearing on whether at the time of President LaForge's August 15, 2014 address to the L&L division, President LaForge knew any statements about Hays were false or entertained "serious doubts" in his mind as to their truth, *Franklin*, 722 So. 2d at 693, nor do we find that these instances constitute actionable defamation.

¶35. In the facts section of his brief, Hays describes President LaForge's address as "a scathing diatribe against Hays." As an example, Hays sets forth an excerpt from President LaForge's address directed at Hays:

> I am telling you to stand down. Bill Hays, I am telling you to stand down. That's my expectation. You and your colleagues are going to be held accountable. The attitudes, the bad behavior, the passive aggressiveness related to your contract non-renewal have infected this Division to the point where it's toxic and it's untenable. It's unprofessional.

Though perhaps harsh, we find that these statements do not constitute actionable defamation.

¶36. Hays also points to a portion of President LaForge's address in which he "accused

16

Hays of 'petulant behavior,' 'killing this Division,' [and] . . . warned Hays'[s] colleagues to distance themselves from Hays." These words, in context, were stated as follows:

> Some of you [(the faculty members)] may have said, "Well, I don't have anything to do with this." Well, let me give you the best path to deal with this. The best way to pull something out of this that is positive, it's this: distance yourself from all of this bitterness, distance yourself from all of this . . . . And, if you continue to perpetuate these things, Bill, and those who champion what you are doing, it's just going to lead to a bad path . . . . Your petulant behavior, others who are supporting you, are killing this Division . . . . So, here's the positive path—you distance yourself from the bad behavior, focus on your students, and focus on, you know, your mission, what you're supposed to be doing here. But, know that these are the expectations we're going to have, and it saddens me to have to come over here and talk about this. I never should have had to do this. He [(Provost McAdams)] shouldn't have to do this. But in this case it became imperative. Because, it [has] just gotten too far, and it [has] gone on for too long. It's over. It can't happen.

Viewed as a whole, we find that President LaForge's frank opinions about the L&L division and his expectations for the future conduct of the faculty do not create an actionable defamation claim.[5]

¶37.  Hays further asserts that President LaForge accused him of "academic malfeasance,"

---

[5] *See, e.g.*, *Ferguson*, 448 So. 2d at 273 (illustrating that statements regarding physicians and their compensation were statements of opinion and not actionable); *Hupp v. Sasser*, 490 S.E.2d 880, 884-85 (W. Va. 1997) (explaining that references to plaintiff's "unprofessional behavior" and "unacceptable behavior" were statements of "non-fact subjective conclusions" that are "clearly not provably false"; statements that plaintiff is "a bully" and that "[h]e tried to bully me," were statements of subjective opinion devoid of provable assertion of fact and not defamatory); *Dong v. Bd. of Tr.*, 236 Cal. Rptr. 912, 920-22 (1987) (stating that letter from professor that criticized colleague's research practices was statement of opinion and not actionable); *Byars v. Kolodziej*, 363 N.E.2d 628, 630 (Ill. App. Ct. 1977) (finding that statement by department head that neither quantity nor quality of professor's published work justified grant of tenure was "mere opinion of the plaintiff's qualifications" and not defamatory).

17

but President LaForge did not. The transcript of the August 15, 2014 address shows that President LaForge said to Hays, "One of the most abominable things, I think, is that you've involved students. That's shameful. It's *probably* academic malfeasance. *I don't know what it is*." (Emphasis added). In any event, again, President LaForge's opinions, though perhaps believed by Hays to be "unfair," do not give rise to an actionable defamation claim.

¶38. Hays also takes issue with President LaForge's comment during his address that "[t]his is Delta State University, not Bill Hays University. And, I think your colleagues need to hear that."[6] This is a factual statement, and it is true. It does not create a basis for a defamation claim. *Jernigan*, 815 So. 2d at 1153 (¶14) ("In defamation actions . . . the threshold question with which this Court is faced, is whether the published statements are false. Truth is a complete defense to [a defamation] action[,] . . . [and] [t]he plaintiff has the burden of proving the falsity of the statement.").

¶39. Lastly, Hays identifies in his brief statements made by President LaForge in communications to third parties following his August 15, 2014 address. We have reviewed these statements in context and find that although some may be considered "caustic commentary," they are "simply not actionable [as defamation]." *Ferguson*, 448 So. 2d at 277.

---

[6] President LaForge repeated this statement in a November 2014 general faculty meeting in response to an anonymously submitted question about Hays's reinstatement. Hays asserts this constituted "[a]nother act of pure malice by LaForge directed at Dr. Hays." We find it constitutes no such thing for the reasons stated above.

18

¶40. In sum, we find that Hays failed to present evidence establishing a genuine issue of material fact that President LaForge spoke with "actual malice" in this case. In particular, our review of the record, including the transcript of President LaForge's August 15, 2014 address to the L&L division, shows that his comments were aimed at encompassing the talking points delineated by Provost McAdams. We find, like the trial court, that although "[t]he comments of LaForge were in a direct and what might be considered a harsh tone," his "comments were aimed at the perceived disruption of normal collegiate life at the university and the extent, if any, to which Hays and perhaps others purportedly contributed to the disruption." This does not constitute "actual malice." On the contrary, in light of the vast amount of information contained in the record evidencing LaForge's knowledge of the events leading up to his address, LaForge's own concerns for the University's well-being, as well as the concerns expressed to him by Provost McAdams and other members of the faculty and administration, we find no evidence creating a genuine issue of material fact that LaForge knew any alleged comments made on August 15, 2014, were false or that he "made them in reckless disregard of their truth." *Smith*, 799 So. 2d at 87 (¶9). Further, although President LaForge may have "sharp[ly] criticized" Hays, and some of his comments may have been "caustic" or even "unfair" in Hays's view, this does not constitute actionable defamation. Accordingly, we affirm the grant of summary judgment in President LaForge's favor on Hays's defamation claim against him.

## II. False Light Invasion of Privacy

19

¶41.    Hays relies on the same purported "proof" of actual malice to support his false-light-invasion-of-privacy claim against President LaForge and offers no other argument on this issue.  To recover for false light invasion of privacy, Hays must demonstrate "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  *Cook v. Mardi Gras Casino Corp.*, 697 So. 2d 378, 382 (Miss. 1997) (citing *Prescott v. Bay St. Louis Newspapers Inc.*, 497 So. 2d 77, 79 (Miss. 1986)).

¶42.    For the same reasons that we affirm the grant of summary judgment in President LaForge's favor with respect to Hays's defamation claim, we likewise find that the trial court properly granted summary judgment in President LaForge's favor on Hays's false-light-invasion-of-privacy claim.  Namely, President LaForge did not make statements of false and defamatory fact concerning Hays, qualified privilege bars Hays's claims, and Hays failed to show the existence of a genuine issue of material fact with respect to the "actual malice" element of his claim.  *See Blake v. Gannett Co.*, 529 So. 2d 595, 606 (Miss. 1988) (holding that "[b]ecause . . . the published statements were true or protected opinion or not clearly directed toward the appellant," summary judgment in the defendants' favor on plaintiff's defamation claim was proper, and the plaintiff's "false light invasion of privacy action was properly dismissed on motion for summary judgment since it was based on the same published statements"); *see also Cook*, 697 So. 2d at 383 (recognizing that the failure to

20

show that defendants "acted in reckless disregard of any falsity" would preclude plaintiff's false light claim); *Prescott*, 497 So. 2d at 80 (recognizing similarity in proof of defamation and false light invasion of privacy); *Isom v. Valley Forge Ins. Co.*, No. 2:16-CV-109-KS-MTP, 2016 WL 7239490, at \*3 (S.D. Miss. Dec. 13, 2016) (Calling the plaintiff "'a piece of s\*\*\*'. . . does not amount to . . . false light invasion of privacy because it does not convey any factual assertion, but is rather the sort of loose, figurative or hyperbolic which would negate the impression that a factual statement was being made." (citations and internal quotation marks omitted)), *aff'd*, 716 F. App'x 280 (5th Cir. 2017).

### III.   Intentional Infliction of Emotional Distress

¶43.    Hays asserts that he presented proof that President LaForge acted with "actual malice" sufficient to overcome summary judgment on his intentional-infliction-of-emotional-distress claim.  For Hays to prevail on this claim, "the severity of the conduct at issue must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 64 (¶41) (Miss. Ct. App. 2011) (quoting *Speed v. Scott*, 787 So. 2d 626, 630 (¶18) (Miss. 2001)).  This "is a tall order in Mississippi," *id.*, and "[t]he liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Brown v. Inter-City Fed. Bank for Sav.*, 738 So. 2d 262, 265 (¶9) (Miss. Ct. App. 1999) (quoting *Lawson v. Heidelberg E.*, 872 F. Supp. 335, 338 (N.D. Miss. 1995)).

¶44. Further, "[a] claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes." *Lee v. Golden Triangle Plan. & Dev. Dist. Inc.*, 797 So. 2d 845, 851 (¶24) (Miss. 2001); *see Brown*, 738 So. 2d at 265 (¶9). As the Court has recognized, "[o]nly in the most unusual cases does the conduct move out of the 'realm of an ordinary employment dispute' into the classification of 'extreme and outrageous,' as required for the tort of intentional infliction of emotional distress." *Brown*, 738 So. 2d at 265 (¶9) (quoting *Prunty v. Ark. Freightways Inc.*, 16 F.3d 649, 654 (5th Cir. 1994)). Specifically, "[m]ere employment disputes not actionable through intentional infliction of emotional distress claims include unfair criticism of job performance, poor evaluations, demands that employees quit or face termination based on fabricated reasons, harassment[,] and termination." *Gardner v. Swedish Match N. Am. Inc.*, No. 2:04cv337-KS-JMR, 2006 WL 2483240, at *4 (S.D. Miss. Aug. 28, 2006) (citations and internal quotation mark omitted).

¶45. In comparison, in *Weible*, this Court described instances that did constitute the requisite outrageous conduct. *Weible*, 89 So. 3d at 64 (¶41). These instances include intentionally hiding an unwed father's child while arranging for the child to be adopted by strangers, *Smith v. Malouf*, 722 So. 2d 490, 498 (Miss. 1998); forging an unwilling customer's signature on a car-sales contract and submitting that contract to a finance company that informed the customer that if he did not make the payments his "credit rating would be destroyed," *T.G. Blackwell Chevrolet Co. v. Eshee*, 261 So. 2d 481, 483 (Miss. 1972); and threatening the elderly mother of a debtor with being sent to jail while using

22

strong profanity, *Lyons v. Zale Jewelry Co.*, 246 Miss. 139, 143, 150 So. 2d 154, 155 (1963). *See Weible*, 89 So. 3d at 64 (¶41).

¶46.    We find that the circumstances here involve what was essentially an employment dispute concerning work-related statements by President LaForge. Based upon the applicable law and our review of the record, we find that Hays has wholly failed to present evidence that President LaForge acted with the requisite "outrageous," "atrocious," and "utterly intolerable" conduct sufficient to create a genuine issue of fact with respect to Hays's intentional-infliction-of-emotional-distress claim.

## CONCLUSION

¶47.    For all the reasons addressed above, we affirm the trial court's grant of summary judgment in President LaForge's favor on all Hays's claims (slander, slander per se (collectively, defamation), false light invasion of privacy, and intentional infliction of emotional distress).

¶48.    **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. LAWRENCE, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**